[821 NE2d 519, 788 NYS2d 281]

Donna McGrath et al., Respondents, v Toys "R" Us, Inc., Appellant.

Argued October 12, 2004; decided November 23, 2004

## POINTS OF COUNSEL

*Quirk and Bakalor, P.C.,* New York City (*H. Nicholas Good-man* and *Charles M. Henderson, III,* of counsel), for appellant. I. This Court should adopt the standards set forth in *Farrar v Hobby* (506 US 103 [1992]). (*Hughes v Rowe,* 449 US 5; *Christianburg Garment Co. v Equal Empl. Opportunity Commn.,* 434 US 412; *McIntyre v Manhattan Ford, Lincoln-Mercury,* 176 Misc 2d 325; *Umansky v Masterpiece Intl.,* 276 AD2d 692; *Cruz v Coach Stores, Inc.,* 202 F3d 560; *Farias v Instructional Sys., Inc.,* 259 F3d 91; *Shannon v Fireman's Fund Ins. Co.,* 156 F Supp 2d 279; *Cabrera v Jakabovitz,* 24 F3d 372; *Pino v Locas-*

*cio,* 101 F3d 235.) II. A new standard has no precedent in New York law. (*Matter of Freeman,* 34 NY2d 1; *Matter of Karp,* 145 AD2d 208; *Matter of Potts,* 213 App Div 59.) III. Adopting respondents' position would encourage litigation of trivial cases. (*Adams v Rivera,* 13 F Supp 2d 550.) IV. To the extent this Court recognizes a significant public purpose exception to the *Farrar* rule, this Court should narrowly limit the exception to cases which lead to ground-breaking conclusions of law. (*Cabrera v Jakabovitz,* 24 F3d 372; *Cabrera v Fischler,* 814 F Supp 269; *LeBlanc-Sternberg v Fletcher,* 143 F3d 748; *Pino v Locascio,* 101 F3d 235; *Adams v Rivera,* 13 F Supp 2d 550; *Heymach v Cardiac Pacemakers,* 183 Misc 2d 584; *Marks v United States,* 430 US 188; *Campbell v St. Tammany Parish School Bd.,* 64 F3d 184.) V. This case does not qualify for the significant public purpose exception. (*McCardle v Haddad,* 131 F3d 43; *Baird v Boies, Schiller & Flexner LLP,* 219 F Supp 2d 510; *Texas State Teachers Assn. v Garland Ind. School Dist.,* 489 US 782; *Buckhannon Bd. & Care Home, Inc. v West Virginia Dept. of Health & Human Resources,* 532 US 598; *Marbley v Bane,* 57 F3d 224; *Matter of Wittlinger v Wing,* 289 AD2d 171; *Matter of Auguste v Hammons,* 285 AD2d 417; *Fish v St. Cloud State Univ.,* 295 F3d 849; *Hensley v Eckerhart,* 461 US 424; *Ciaprazi v County of Nassau,* 195 F Supp 2d 398.)

*Shanahan & Associates, P.C.,* New York City (*Thomas D. Shanahan* of counsel), and *Meltzer Lopresti, LLP* (*Anthony A. LoPresti* of counsel), for respondents. I. This Court must not apply the *Farrar v Hobby* (506 US 103 [1992]) standard because the drafters of the Administrative Code of the City of New York explicitly stated that "judges interpreting the City's Human Rights Law are not to be bound by restrictive state and federal rulings and are to take seriously the requirement that this law be liberally and independently construed." (*Matter of Wittlinger v Wing,* 99 NY2d 425; *Shannon v Fireman's Fund Ins. Co.,* 156 F Supp 2d 279; *McIntyre v Manhattan Ford, Lincoln-Mercury,* 176 Misc 2d 325; *Hensley v Eckerhart,* 461 US 424.) II. Precedent established by both this Court and the Second Circuit pre-*Farrar v Hobby* (506 US 103 [1992]), if applied broadly, provides the proper standard to determine what constitutes a reasonable fee award for a prevailing party who has received only nominal damages. (*Ruggiero v Krzeminski,* 928 F2d 558; *Ortiz v Regan,* 980 F2d 138; *Fassett By & Through Fassett v Haeckel,* 936 F2d 118; *Milwe v Cavuoto,* 653 F2d 80; *McCann v Coughlin,* 698 F2d 112; *Matter of Thomasel v Perales,* 78 NY2d 561; *Joseph v Ruffo,* 64 NY2d 980; *Matter of Johnson v Blum,* 58 NY2d 454;

*Matter of Freeman,* 34 NY2d 1; *Matter of Karp,* 145 AD2d 208.) III. Under *Farrar v Hobby* (506 US 103 [1992]) the Administrative Code of the City of New York still authorizes a fee award here because respondents' case did serve a significant public purpose under both a restrictive and broad interpretation of "significant public purpose" as mandated by the drafters of the Administrative Code. (*Carroll v Blinken,* 105 F3d 79; *Blanchard v Bergeron,* 489 US 87; *Quaratino v Tiffany & Co.,* 166 F3d 422; *Cabrera v Jakabovitz,* 24 F3d 372; *Farias v Instructional Sys., Inc.,* 259 F3d 91; *DeFilippo v Morizio,* 759 F2d 231; *Adams v Rivera,* 13 F Supp 2d 550; *LeBlanc-Sternberg v Fletcher,* 143 F3d 748; *Red Cloud-Owen v Albany Steel, Inc.,* 958 F Supp 94; *Ciaprazi v County of Nassau,* 195 F Supp 2d 398.) IV. Respondents' case served a significant public purpose where clear distinctions exist between prior cases; respondents' case was the first public accommodation case to proceed to trial and secure a favorable jury verdict and the law was so unclear that the New York City Council had to enact a law to clarify the Administrative Code of the City of New York. (*Maffei v Kolaeton Indus.,* 164 Misc 2d 547; *Matter of Rivera,* 165 Misc 2d 307; *Davidson v Aetna Life & Cas. Ins. Co.,* 101 Misc 2d 1; *Richards v United States Tennis Assn.,* 93 Misc 2d 713; *Matter of Denise R. v Lavine,* 39 NY2d 279.)

*Lansner & Kubitschek,* New York City (*Carolyn A. Kubitschek* of counsel), *Eugene B. Nathanson* and *Norman L. Reimer* for New York County Lawyers' Association, amicus curiae. I. The New York City Council's intent to encourage private enforcement of the Human Rights Law would be frustrated by a stringent standard for awarding attorney's fees. (*Carney v Philippone,* 1 NY3d 333; *Chambers v TRM Copy Ctrs. Corp.,* 43 F3d 29; *Newman v Piggie Park Enters., Inc.,* 390 US 400; *Christianburg Garment Co. v Equal Empl. Opportunity Commn.,* 434 US 412; *Northcross v Board of Educ. of Memphis City Schools,* 412 US 427; *Hughes v Rowe,* 449 US 5; *Farrar v Hobby,* 506 US 103; *Hensley v Eckerhart,* 461 US 424; *Ruggiero v Krzeminski,* 928 F2d 558; *Crue v Aiken,* 370 F3d 668.) II. This Court should adopt the attorney fee standard formulated in *Hensley v Eckerhart* (461 US 424 [1983]). (*City of Riverside v Rivera,* 477 US 561; *Texas State Teachers Assn. v Garland Ind. School Dist.,* 489 US 782.)

*Michael A. Cardozo, Corporation Counsel,* New York City (*Edward F.X. Hart* and *Tahirih M. Sadrieh* of counsel), for City of New York, amicus curiae. I. This Court should adopt the *Far-*

*rar v Hobby* (506 US 103 [1992]) standard in evaluating a reasonable attorney's fee under the New York City Human Rights Law. (*Umansky v Masterpiece Intl.,* 276 AD2d 692; *Ferrante v American Lung Assn.,* 90 NY2d 623; *Farias v Instructional Sys., Inc.,* 259 F3d 91; *Hensley v Eckerhart,* 461 US 424; *Matter of Johnson v Blum,* 58 NY2d 454; *Newman v Piggie Park Enters., Inc.,* 390 US 400; *Northcross v Memphis Bd. of Educ. of Memphis City Schools,* 412 US 427; *Hooper Assoc. v AGS Computers,* 74 NY2d 487; *Baker v Health Mgt. Sys.,* 98 NY2d 80; *Matter of New York State Clinical Lab. Assn. v Kaladjian,* 85 NY2d 346.) II. New York should not adopt a public purpose exception to the *Farrar v Hobby* (506 US 103 [1992]) rule. (*Cabrera v Jakabovitz,* 24 F3d 372; *Cabrera v Fischler,* 814 F Supp 269; *Pino v Locascio,* 101 F3d 235; *Maffei v Kolaeton Indus.,* 164 Misc 2d 547; *Buckhannon Bd. & Care Home, Inc. v West Virginia Dept. of Health & Human Resources,* 532 US 598; *Texas State Teachers Assn. v Garland Ind. School Dist.,* 489 US 782; *Hensley v Eckerhart,* 461 US 424; *Hewitt v Helms,* 482 US 755.)

*Craig Gurian,* Brooklyn, for Anti-Discrimination Center of Metro New York, Inc., and others, amici curiae. I. Adoption of the *Farrar v Hobby* (506 US 103 [1992]) standards would contradict New York City's intention that its Human Rights Law be construed independently and liberally to achieve the law's broad, remedial objectives. (*Farias v Instructional Sys., Inc.,* 259 F3d 91; *Matter of Cahill v Rosa,* 89 NY2d 14; *Ruggiero v Krzeminski,* 928 F2d 558; *Milwe v Cavuoto,* 653 F2d 80; *McCann v Coughlin,* 698 F2d 112; *Buckhannon Bd. & Care Home, Inc. v West Virginia Dept. of Health & Human Resources,* 532 US 598; *Matter of 119-121 E. 97th St. Corp. v New York City Commn. on Human Rights,* 220 AD2d 79; *Hughes v Rowe,* 449 US 5; *Christianburg Garment Co. v Equal Empl. Opportunity Commn.,* 434 US 412; *Estate of Farrar v Cain,* 941 F2d 1311.) II. Establishment of liability should in general be sufficient to justify the award of attorney's fees. (*New York State Club Assn. v City of New York,* 69 NY2d 211; *Levin v Yeshiva Univ.,* 96 NY2d 484.)

**OPINION OF THE COURT**

GRAFFEO, J.

In *Farrar v Hobby* (506 US 103 [1992]), the United States Supreme Court concluded that a plaintiff in a federal civil rights action who obtains only nominal damages is a "prevailing party" eligible to apply for an attorney's fee award but that an award in those circumstances would rarely be appropriate un-

less the litigation served a significant public purpose. Certifying four questions to this Court, the United States Court of Appeals for the Second Circuit has asked us to address whether the *Farrar* standard is applicable to attorney's fees awarded under the New York City Human Rights Law. Because the attorney's fee provision of the New York City Human Rights Law is textually indistinguishable from the federal statutes interpreted in *Farrar* and we find nothing in the legislative history that directs a different standard, we conclude that counsel fee awards under the City Human Rights Law are subject to the *Farrar* analysis.

## I.

The three plaintiffs in this action, who identify themselves as preoperative transsexuals, commenced a federal action against defendant Toys "R" Us alleging that they were harassed by store employees while shopping in a Toys "R" Us store in December 2000. Plaintiffs contended that defendant's employees violated the New York City Human Rights Law, a civil rights statute that prohibits discrimination in public accommodation. In the complaint, plaintiffs sought compensatory and actual damages in an amount not less than $100,000 for each plaintiff, punitive damages in an amount not less than $100,000 for each plaintiff, attorney's fees and injunctive relief.

A nine-day jury trial ensued in June 2002. At trial, plaintiffs' attorney requested substantial compensatory and punitive damages, but did not seek injunctive relief. The jury rendered a verdict in favor of plaintiffs, finding that the conduct of defendant's employees violated plaintiffs' rights under the New York City Human Rights Law, but awarded damages of only $1 for each plaintiff.

Following the trial, plaintiffs applied for attorney's fees in the amount of approximately $206,000. Defendant opposed the request, arguing that a fee award was not warranted because plaintiffs had received only nominal damages. Noting that the attorney's fee provision in the New York City Human Rights Law is similar to the fee provisions in the federal civil rights statutes, the court applied the rule articulated by the United States Supreme Court in *Farrar v Hobby* (506 US 103 [1992]). In *Farrar*, the Supreme Court held that it will rarely be appropriate to grant attorney's fees in a case where plaintiff obtained only nominal damages unless the case served a significant public purpose. While recognizing that fee awards in nominal damages cases are not the norm, the District Court in this

case concluded that "[t]his case is one of those unusual and infrequent instances in which attorneys fees should be awarded." The court observed that this was the first public accommodation discrimination case to proceed to trial under the New York City Human Rights Law and the first case in which the rights of transsexuals were asserted and vindicated. In addition, at the time this action was commenced, it was unclear whether the New York City Human Rights Law covered transsexuals as the law was not amended to specifically include that class of individuals until just prior to trial. Ultimately, the District Court awarded attorney's fees in the amount of $193,551, the "lodestar" figure calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate.

Defendant appealed the attorney's fee determination to the Second Circuit, which noted that there are virtually no New York cases interpreting or applying the fee provision in the New York City Human Rights Law. Accordingly, the Second Circuit certified the following questions to this Court:

"1. In determining whether an award of attorney's fees is reasonable under New York City Administrative Code § 8-502(f), does New York apply the standards set forth in *Farrar v. Hobby*, 506 U.S. at 114-15, i.e., (a) that 'the most critical factor . . . is the degree of success,' and (b) that when a party is awarded nominal damages, 'the only reasonable fee is usually no fee at all'?

"2. If the *Farrar* standard does not apply, what standard should a court use to determine what constitutes a reasonable fee award for a prevailing party who has received only nominal damages?

"3. If the *Farrar* standard applies, does Administrative Code § 8-502(f) authorize a fee award to a prevailing plaintiff who receives only nominal damages but whose lawsuit served a significant public purpose?

"4. If New York recognizes 'service of a significant public purpose' as a factor warranting an attorney's fee award to a plaintiff recovering only nominal damages, would a plaintiff who is the first to secure a favorable jury verdict on a claim of unlawful

discrimination against transsexuals in public accommodation, *see* N.Y. City Admin. Code § 8-107.4(a), be entitled to a fee award even though the law's prohibition of discrimination against transsexuals in employment, *see id.* § 8-107.1(a), has previously been recognized?" (*McGrath v Toys "R" Us, Inc.*, 356 F3d 246, 254 [2d Cir 2004].)

We accepted the certified questions and now answer questions 1, 3 and 4 in the affirmative, rendering question 2 academic.

## II.

Although the District Court employed the *Farrar* standard when it awarded attorney's fees, plaintiffs now argue that this Court should decline to follow *Farrar* because the rule is unduly restrictive. Plaintiffs suggest that *Farrar* was a significant departure from prior federal fee award jurisprudence that will impede the ability of individuals who have suffered discrimination to retain counsel to prosecute a meritorious civil rights claim. In urging rejection of the federal approach, plaintiffs primarily rely on statements in the legislative history of the local law that suggest that the law is intended to be broadly construed to effectuate its remedial purposes.

In New York, civil rights are cherished and highly protected. Legislation at the state and local levels prohibits discrimination in many spheres, including housing, employment and public accommodation. The litigation in this case was brought under the public accommodation provision of the New York City Human Rights Law, which protects against discrimination based on "actual or perceived race, creed, color, national origin, age, gender, disability, marital status, sexual orientation or alienage or citizenship status" (Administrative Code of City of NY § 8-107 [4] [a]).

A private action under the New York City Human Rights Law has been authorized since 1991 when the City Council amended the Code to grant the right to sue to any individual in a protected class who is subjected to discriminatory treatment. The legislation also gave a private party who prevailed in the lawsuit the right to seek attorney's fees. The fee provision states: "[i]n any civil action commenced pursuant to this section, the court, in its discretion, may award the prevailing party costs and reasonable attorney's fees" (Administrative Code § 8-502 [f]).

The attorney's fee provision is indistinguishable from provisions in comparable federal civil rights statutes. For example,

title VII of the Civil Rights Act of 1964's attorney's fee statute authorizes a court, in its discretion, to "allow the prevailing party . . . a reasonable attorney's fee . . . as part of the costs" (42 USC § 2000e-5 [k]). Similarly, 42 USC § 1988 (b), applicable to a myriad of civil rights claims, provides that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

Where our state and local civil rights statutes are substantively and textually similar to their federal counterparts, our Court has generally interpreted them consistently with federal precedent (*see Forrest v Jewish Guild for Blind*, 3 NY3d 295, 305 n 3 [2004]; *Rainer N. Mittl, Ophthalmologist, P.C. v New York State Div. of Human Rights*, 100 NY2d 326 [2003]; *Matter of Aurecchione v New York State Div. of Human Rights*, 98 NY2d 21 [2002]; *Ferrante v American Lung Assn.*, 90 NY2d 623, 629 [1997]). For instance, we have held that federal burden-shifting standards apply to claims brought under the state and local Human Rights Laws (*see Forrest v Jewish Guild for Blind*, 3 NY3d at 305 n 3; *Mittl v New York State Div. of Human Rights*, 100 NY2d at 330-331). Where state and local provisions overlap with federal statutes, our approach to resolution of civil rights claims has been consistent with the federal courts in recognition of the fact that, whether enacted by Congress, the State Legislature or a local body, these statutes serve the same remedial purpose—they are all designed to combat discrimination.

Under the comparable federal civil rights statutes authorizing fee awards, federal courts employ a two-step process for determining whether a discretionary attorney's fee award is appropriate (*see Hensley v Eckerhart*, 461 US 424, 433 [1983]). First, in order to be eligible to apply for an award, plaintiff must be a "prevailing party" in the litigation. If this threshold requirement is met, the court must then determine what constitutes a reasonable award, a discretionary inquiry that takes into account a multitude of factors, although "the most critical factor is the degree of success obtained" (*id.* at 436).[1] The determination is relatively straightforward when a plaintiff obtains

---

1. The factors are: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in sim-

what amounts to complete relief—plaintiff is usually entitled to an award that compensates counsel for the time reasonably expended in the lawsuit (*id.* at 435). Commonly referred to as the "lodestar" method, the amount of the award is calculated by multiplying the number of hours reasonably expended by a reasonable hourly rate, a procedure that subsumes many of the factors (*id.* at 434 n 9).

Since its 1983 decision in *Hensley v Eckerhart*, the Supreme Court has made clear that where a plaintiff obtains only partial success, the procedure for assessing a reasonable counsel fee award is more complex. The inquiry is not answered merely by applying the lodestar formula because, if plaintiff "has achieved only partial or limited success," an award based solely on the lodestar figure may be excessive (*id.* at 436). Emphasizing that calculation of an appropriate fee award is a discretionary procedure best left in the hands of trial courts who have a "superior understanding of the litigation," the Court noted that the trial court "should make clear that it has considered the relationship between the amount of the fee awarded and the results obtained" (*id.* at 437). If plaintiff has attained only partial success, the award may be adjusted accordingly.

In its 1992 decision in *Farrar v Hobby*, the Supreme Court addressed a particular type of partial success case—the circumstance where a plaintiff obtains a favorable civil rights judgment on the merits but the only relief granted is nominal damages. The issue was whether a plaintiff who received only nominal damages was a "prevailing party" eligible to seek attorney's fees. The District Court in *Farrar* had awarded plaintiffs attorney's fees in the amount of $280,000, but the Fifth Circuit vacated the award, concluding plaintiffs were not prevailing parties and, as such, were ineligible for an attorney's fee award.

All nine members of the Supreme Court concluded that plaintiffs were prevailing parties under the federal statutes,

---

ilar cases" (*Hensley v Eckerhart*, 461 US at 430 n 3). New York courts have employed these factors to determine reasonable attorney's fee awards in New York City Human Rights Law claims (*see McIntyre v Manhattan Ford, Lincoln-Mercury, Inc.*, 176 Misc 2d 325 [Sup Ct, NY County 1997], *appeal dismissed* 256 AD2d 269 [1st Dept 1998], *appeal dismissed* 93 NY2d 919 [1999], *lv denied* 94 NY2d 753 [1999] [where plaintiff received a judgment of more than $3 million, trial court awarded $268,156 in attorney's fees]; *Bell v Helmsley*, 2003 NY Slip Op 50866[U] [Sup Ct, NY County 2003] [where plaintiff obtained verdict in the amount of $11 million, later reduced to $554,000, court awarded $568,340 in attorney's fees]).

clarifying that "the prevailing party inquiry does not turn on the magnitude of the relief obtained" (*Farrar v Hobby*, 506 US at 114). The Court explained that "a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff" (*id.* at 111-112). Because a damages judgment, whatever the amount, forces defendant to pay a sum to plaintiff that defendant would not otherwise be required to pay, it modifies defendant's behavior in a manner beneficial to plaintiff, making plaintiff a prevailing party.

The Court split, however, on whether it should review the propriety of the amount of the award. Four Justices saw "no reason for the Court to reach out and decide what amount of attorney's fees constitutes a reasonable amount in this instance" because "[t]hat issue was neither presented in the petition for certiorari nor briefed by petitioners" (*id.* at 123 [partial dissent]). In contrast, the majority reasoned that "[a]lthough the 'technical' nature of a nominal damages award or any other judgment does not affect the prevailing party inquiry, it does bear on the propriety of fees awarded" (*id.* at 114). In other words, the Court held that the fact that plaintiff obtained only nominal damages went to the second part of the attorney's fee inquiry—the reasonableness of the award.

The Court emphasized its previous holding in *Hensley* that "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained," thereby reasserting that where a plaintiff achieves only limited success, an award determined solely by calculating the lodestar may be excessive (*id.* [internal quotation marks omitted]). Applying that principle, the Court concluded that "[w]hen a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief . . . the only reasonable fee is usually no fee at all" (*id.* at 115 [internal citation omitted]). Comparing the amount of damages sought by the plaintiff ($17 million) with the amount recovered ($1), the Court found that the plaintiff in *Farrar* had obtained only a de minimis victory rendering any fee award in that case unreasonable as a matter of law.

Justice O'Connor concurred, but wrote separately to clarify that the difference between the amount of damages recovered and the amount sought is not the only factor to be considered in determining the degree of a plaintiff's success in a nominal

damages case. In appropriate cases, the court can consider the significance of the legal issue on which plaintiff prevailed and whether the litigation "accomplished some public goal other than occupying the time and energy of counsel, court, and client" (*id.* at 121-122 [concurring op]). This analysis has been referred to as the "significant public purpose" exception to the *Farrar* rule.

Federal courts have interpreted *Farrar* as holding that "while there is no *per se* rule that a plaintiff recovering nominal damages can never get a fee award . . . the award of fees in such a case will be rare" (*Pino v Locascio*, 101 F3d 235, 238 [2d Cir 1996]) and is appropriate only when plaintiff's success can be viewed as significant despite the failure to obtain more meaningful relief. For example, in *Cabrera v Jakabovitz* (24 F3d 372, 393 [2d Cir 1994], *cert denied* 513 US 876 [1994]), the Second Circuit held that a defendant who was ordered to pay only nominal damages could nonetheless be subject to pay an attorney's fee award because "plaintiffs prevailed on a significant legal issue—namely, that landlords can be held liable for employing real estate brokers who are engaged in racial steering." Quoting Justice O'Connor's concurrence, the court noted that "[o]ne does not search 'in vain for the public purpose' this litigation has served" (*id.*). But in a hostile work environment sexual harassment claim where plaintiff received only nominal damages and no new rule of law was recognized or applied, the Second Circuit relied on the *Farrar* standard to vacate an attorney's fee award (*see Pino v Locascio*, 101 F3d at 239). In *Pino*, the court found that "[t]he vast majority of civil rights litigation does not result in ground-breaking conclusions of law, and therefore, will only be appropriate candidates for fee awards if a plaintiff recovers some significant measure of damages or other meaningful relief" (*id.*).

█ Primarily relying on the legislative history of the 1991 amendment to the New York City Human Rights Law, plaintiffs in this case argue that the *Farrar* standard should not be applied to attorney's fee claims under the local law notwithstanding the fact that the language in the fee provision is substantively indistinguishable from the federal attorney's fee statutes. We are unpersuaded. There are many general statements in the legislative history indicating that the private right of action provision, adopted to keep the City at the forefront of human rights protection, should be liberally construed (*see e.g.* Report of Legal Div, Comm on Gen Welfare, at 12-13, Local Law Bill Jacket, Lo-

cal Law No. 39 [1991] of City of New York). As we recently observed when interpreting the punitive damages provision of the New York City Human Rights Law, added in the same 1991 legislation, "[t]hese statements merely reflect the broad policy behind the local law to discourage discrimination" (*Krohn v New York City Police Dept.*, 2 NY3d 329, 337 [2004]). But, in this instance, such broad expressions of overriding policy offer no basis to overlook the textual similarities between the local law fee provision and the federal statutes or to abandon our general practice of interpreting comparable civil rights statutes consistently, particularly since these broad policies are identical to those underlying the federal statutes.

There is sparse reference to the attorney's fee provision— Administrative Code § 8-502 (f)—in the legislative history, much less an indication that it is to be interpreted differently from its federal counterparts. In the Report of the Legal Division prepared for the City Council, a distinction is drawn between the city law as amended and the State Human Rights Law (*see* Executive Law § 296) since the latter does not authorize attorney's fee awards (Report of Legal Div, Comm on Gen Welfare, Section-by-Section Analysis, at 34-35, Local Law Bill Jacket, Local Law No. 39 [1991]). But no distinct standard for determining fee awards is described, nor is there any criticism of the federal approach to such awards. Certainly, there is no reference to the narrow issue we address today—how attorney's fees are to be determined in nominal damages cases.

Granted, it is not surprising that the legislative history does not address the *Farrar* rule since the amendments predated *Farrar* by one year. But if *Farrar* constituted a departure from the attorney fee standard the City Council intended to adopt as plaintiffs suggest, we cannot discern it. The City Council has not hesitated in other circumstances to amend the New York City Human Rights Law to clarify its disagreement with evolving Supreme Court precedent. At the same time it added the private right of action provision in 1991, the City Council amended other parts of the Human Rights Law to expressly reject the Supreme Court's then-recent disparate impact analysis in *Wards Cove Packing Co., Inc. v Atonio* (490 US 642 [1989]) and to adopt for purposes of the New York City Human Rights Law the approach taken in the Supreme Court's prior decision in *Griggs v Duke Power Co.* (401 US 424 [1971]; *see* Administrative Code § 8-107 [17]; Report of Legal Div, Comm on Gen Welfare, Section-by-Section Analysis, at 22-23, Local Law Bill

Jacket, Local Law No. 39 [1991]).[2] Despite its evident willingness to amend the Human Rights Law to establish legal guidelines different from those of the Supreme Court, here the City Council has not acted to alter the attorney's fee provision in the 12 years since *Farrar*.[3] And, perhaps most significantly, long before *Farrar*, the Supreme Court had emphasized in *Hensley* that the degree of success obtained was the critical factor in determining a reasonable award in a case where plaintiff obtained only limited success. If the City Council disagreed with that approach, it had ample opportunity to say so.

Instead, the City Counsel adopted a fee provision that appears to have been modeled after the federal statutes interpreted in *Farrar*. Because the provision is substantively and textually indistinguishable from its federal counterparts, and absent any basis in the legislative history for a different standard, we conclude that the *Farrar* standard is applicable to attorney's fee claims under the New York City Human Rights Law.

### III.

■ The Second Circuit has not asked us to apply the *Farrar* standard to the facts and circumstances of this case, or to review whether it was appropriate for the District Court to grant attorney's fees in the full lodestar figure given the extent of relief plaintiffs obtained. These tasks it has reserved to itself. As we understand question 4, we are to determine whether this claim could have fallen within the "significant public purpose" exception addressed in the *Farrar* concurrence even though, prior to this litigation, some courts had held that transsexuals were protected from employment discrimination under the New York City Human Rights Law. We answer the fourth question in the affirmative because we cannot say, as a matter of law, that a court that reached that conclusion would have abused its discretion.

New York City Administrative Code § 8-107 (4) (a) prohibits discrimination in public accommodation on the following

---

2. Consistent with this distinction between the local law and its state and federal counterparts, this Court applied the *Griggs* disparate impact analysis in *Levin v Yeshiva Univ.* (96 NY2d 484 [2001]) when determining whether plaintiffs had stated a claim for sexual orientation discrimination under the New York City Human Rights Law.

3. Notably, other aspects of the law have been amended during that time frame. As addressed in part III of this decision, the City Council amended the local law in 2002 by adding a new definition of "gender" to avoid what it viewed as an unduly narrow interpretation of that term by the courts.

grounds: "actual or perceived race, creed, color, national origin, age, gender, disability, marital status, sexual orientation or alienage or citizenship status." Administrative Code § 8-107 (1)—which covers discrimination in employment—protects the same classes of individuals. At the time this litigation was commenced, the term gender was not defined in the Administrative Code and the term "sexual orientation" was defined as "heterosexuality, homosexuality, or bisexuality" (Administrative Code § 8-102 [20]). Thus, the former provision did not explicitly encompass discrimination based on transsexualism.

There were lower court decisions concluding that employment discrimination based on transsexualism fell under the anti-discrimination umbrella of the Code. For example, in *Maffei v Kolaeton Indus.* (164 Misc 2d 547 [Sup Ct, NY County 1995]), the trial court ruled that a person who identified herself as a transsexual had stated a claim under the New York City Human Rights Law's prohibition of gender discrimination in employment, despite the failure of the Code to expressly cover transsexuals. The New York City Commission on Human Rights had reached the same conclusion in administrative decisions (*see e.g. Matter of Arroyo v New York City Health & Hosp. Corp.*, 1994 WL 932424 [NY City Commn on Human Rights 1994]).

About two months before this case went to trial, the City Council passed legislation that added a new definition of "gender" to the New York City Human Rights Law, erasing any doubt about whether transsexuals were protected under the Code (*see* Administrative Code § 8-102 [23]; Local Law No. 3 [2002] of City of New York).[4] The legislative history of the local law indicates that the City Council believed that the scope of the existing gender-based discrimination provision required clarification (*see* Local Law 3, § 1 ["Legislative findings and intent"]). In other words, the City Council determined that, in its view, the Code already protected transsexuals but was concerned that, without the amendment, the law could be misinterpreted as excluding this class of individuals from coverage.

In the District Court and again in this Court, defendant has emphasized that at the time this action was commenced, there

---

4. The law now provides: "The term 'gender' shall include actual or perceived sex and shall also include a person's gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to that person at birth" (Administrative Code § 8-102 [23]).

were lower court decisions interpreting the Code as protecting transsexuals from discrimination in employment. As such, defendant argues that this litigation was not significant. We do not believe that the latter necessarily follows from the former. As was apparent to the City Council, the fact that a handful of lower courts had interpreted the statute broadly did not put to rest the scope of coverage issue.

In this case, the District Court reasoned that the verdict was significant and performed a public purpose because it involved a series of "firsts"—e.g., it was the first public accommodation case that went to verdict under the New York City Human Rights Law, and was the first judgment in favor of transsexuals. We cannot conclude that a judgment in favor of a historically unrecognized group can never serve an important public purpose; a groundbreaking verdict can educate the public concerning substantive rights and increase awareness as to the plight of a disadvantaged class. Particularly in the civil rights arena, a jury verdict can communicate community condemnation of unlawful discrimination. It is therefore reasonable for a court to consider whether the verdict served this function in determining the significance of the relief obtained, although this is neither the only factor that may be considered nor will it necessarily be determinative.

Given the uncertain state of the law at the time this action was commenced and the fact that the breadth of the Code was not clarified until shortly before trial, many city residents might have been unaware at the time of verdict that discrimination against transsexuals was prohibited. We are therefore unpersuaded that the fact that a few lower courts had interpreted the Code as covering transsexuals rendered plaintiffs' verdict—the first of its kind—insignificant as a matter of law. In light of the procedural posture of this case, the fact-dependent nature of the "significant public purpose" inquiry and the limits of certified question 4, we have no occasion to further address the District Court determination in this regard.[5]

Accordingly, certified questions 1, 3 and 4 should be answered in the affirmative and certified question 2 not answered upon the ground that it has been rendered academic.

---

5. The factors addressed in the dissent may be relevant to the federal court that will be evaluating the propriety of the fee award in this case. However, we are not asked in certified question 4 to determine whether this particular fee was warranted under the facts and circumstances of this case.

READ, J. (dissenting). I dissent with respect to certified question 4 only, which I would answer in the negative.

In *Cabrera v Jakabovitz* (24 F3d 372 [2d Cir 1994])—the Second Circuit's seminal case applying the "significant public purpose" exception of *Farrar v Hobby* (506 US 103 [1992])—the court approved attorney's fees based on its conclusion that the plaintiffs had "prevailed on a significant legal issue—namely, that landlords can be held liable for employing real estate brokers who are engaged in racial steering" (24 F3d at 393). In *Cabrera*, the plaintiffs, by creating a new rule making landlords vicariously liable for the discriminatory actions of the real estate brokers that they employ, prevailed on a novel issue of law that served a significant public purpose. As the Second Circuit later stressed in *Pino v Locascio* (101 F3d 235, 239 [2d Cir 1996]), however, the holding in *Cabrera* was "limited." "The vast majority of civil rights litigation does not result in ground-breaking conclusions of law, and therefore, will only be appropriate candidates for fee awards if a plaintiff recovers some significant measure of damages or other meaningful relief" (*id.*).

The plaintiffs here recovered only nominal damages and sought no injunctive relief. Under *Farrar* and the relevant Second Circuit precedent, *Cabrera* and *Pino*, adopted by us today, the question then becomes whether these plaintiffs achieved a "ground-breaking conclusion[ ] of law."

"[W]hen courts speak of issues of first impression, they speak only of these relatively few cases, which require consideration of adjustments of substantive rules of law" (*Tancredi v Metropolitan Life Ins. Co.*, 256 F Supp 2d 196, 201 [SD NY 2003], *revd on other grounds* 378 F3d 220 [2d Cir 2004]). This is primarily because,

> "[a]t too high a level of generality, there are no cases of first impression, while at too low a level, every case is one of first impression. . . . [A]lthough every motor vehicle accident case is one of 'first impression,' there are very few indeed in which the factual context from which they are born requires courts to give serious consideration to altering or adjusting legal rules in order to resolve them. So too in all areas of the law" (*id.*).

While in some instances the first jury verdict pursuant to a particular statutory provision may qualify as a case of first impression, this cannot be so where, as here, the purportedly groundbreaking legal principle—the recognition of transsexuals

as members of a protected class safeguarded against discrimination by the New York City Human Rights Law—had already been supported by the only courts to have considered the question (*see Maffei v Kolaeton Indus.*, 164 Misc 2d 547 [Sup Ct, NY County 1995]; *Rentos v Oce-Office Sys.*, 1996 WL 737215, 1996 US Dist LEXIS 19060 [SD NY, Dec. 24, 1996]). As the majority points out, the New York City Commission on Human Rights, the administrative agency responsible for interpreting and enforcing the New York City Human Rights Law, had endorsed the same reading of the Human Rights Law in its administrative decisions.

In *Maffei*, which preceded plaintiffs' action by over six years, Supreme Court expressly rejected the argument of a transsexual plaintiff's employer that the New York City Human Rights Law did not recognize transsexuals as a protected class. In refusing to adopt the employer's narrow interpretation of the statutory phrase "discrimination based on sex," the court explained that the "New York City law is intended to bar *all forms of discrimination* in the workplace and to be broadly applied" (164 Misc 2d at 555 [emphasis added]). In *Rentos*, the United States District Court for the Southern District of New York embraced *Maffei*'s interpretation, holding that the transsexual plaintiff's complaint, alleging employment discrimination based on "sex," "clearly allege[d] membership in what at least one court has found to be a protected class under city and state law" (1996 WL 737215, *9, 1996 US Dist LEXIS 19060, *26). The present litigation cannot be viewed as groundbreaking when the pioneering legal precedent had already been this firmly established.

Although believing that the New York City Human Rights Law already protected transsexuals against discrimination, the New York City Council adopted an amendment in 2002 to guard against any misinterpretation. The majority views the Council's action in this regard as further evidence of the uncertain state of the law when plaintiffs commenced this litigation. Once the amendment was enacted on April 30, 2002, however, plaintiffs' trial, which did not begin until about two months later, was rendered even more obviously irrelevant to establishing the protection of transsexuals under the New York City Human Rights Law.

In fact, the law was so certain that defendant Toys "R" Us never challenged plaintiffs' assertion that, as pre-operative transsexuals, they were members of a protected class under

Administrative Code § 8-107 (4). To the contrary, defendant acknowledged from the outset of this litigation that section 8-107 (4) of the Code, proscribing discrimination in places of public accommodation, applied to transsexuals and to plaintiffs as pre-operative transsexuals. Settlement talks collapsed on the eve of trial when plaintiffs demanded $600,000 (just reduced from $3.2 million plus attorney's fees), and defendant signaled a willingness to enter into productive negotiations only if plaintiffs lowered their demand to $60,000 (increased from a longstanding offer of $10,000). At trial, the parties litigated only factual issues related to whether and to what extent defendant's actions discriminated against plaintiffs. In short, defendant never contested the supposedly novel issue of law on which plaintiffs prevailed and premise their request for attorney's fees.

An attorney's fee provision in an anti-discrimination statute "is not a relief Act for lawyers" (*Farrar, supra,* 506 US at 122 [O'Connor, J., concurring] [citation and internal quotation marks omitted]). Rather, there is a strong "public interest in preventing dubious or trivial claims from flooding the . . . courts" (*Adams v Rivera,* 13 F Supp 2d 550, 553 [SD NY 1998]). If the fee provision in Administrative Code § 8-502 (f) encourages a gold rush of attorneys promoting doubtful or inconsequential claims, it will be of little value to either legitimate civil rights plaintiffs or the general public. Nor does the judicial system as a whole benefit from "a second [round of] litigation of significant dimension" over the propriety of attorney's fees (*Texas State Teachers Assn. v Garland Ind. School Dist.,* 489 US 782, 791 [1989]).

An attorney's fee provision in a civil rights statute is a tool that, used sparingly, "ensures the vindication of important rights, even when large sums of money are not at stake, by making attorney's fees available under a private attorney general theory" (*Farrar,* 506 US at 122 [O'Connor, J., concurring]). Here, plaintiffs failed to accomplish any important public goal as private attorneys general by litigating a civil rights issue that had already been resolved in favor of transsexuals by the courts.

Chief Judge KAYE and Judges G.B. SMITH, CIPARICK and ROSENBLATT concur with Judge GRAFFEO; Judge READ dissents in part and votes to answer certified question 4 in the negative in a separate opinion in which Judge R.S. SMITH concurs.

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the ques-

tions by this Court pursuant to section 500.17 of the Rules of Practice of the Court of Appeals (22 NYCRR 500.17), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified questions 1, 3 and 4 answered in the affirmative and certified question 2 not answered upon the ground that it has been rendered academic.