[872 NYS2d 27]

GINA WILLIAMS, Appellant, v NEW YORK CITY HOUSING AUTHORITY et al., Respondents.

First Department, January 27, 2009

**APPEARANCES OF COUNSEL**

*Gina Williams*, appellant pro se.

*Ricardo Elias Morales*, New York City (*Steven J. Rappaport* and *Donna M. Murphy* of counsel), for respondents.

**OPINION OF THE COURT**

ACOSTA, J.

## Introduction

This appeal presents us with the opportunity to construe for the first time the Local Civil Rights Restoration Act of 2005 (Local Law No. 85 [2005] of City of NY [Restoration Act]).

Defendants' summary judgment motion—addressed to an amended complaint alleging a hostile work environment, disparate treatment on the basis of sex, and retaliation in violation of applicable provisions of the Executive Law and the New York City Administrative Code—was granted in its entirety. While we agree with the motion court that the claims arising under both

the State and City Human Rights Laws must be dismissed, we take a different approach and consider the city claims under the commands of the Restoration Act, as a distinct analysis is required to fully appreciate and understand the distinctive and unique contours of the local law in this area.

## Background

Plaintiff was, at all times relevant to the action, an employee of defendant Housing Authority. From November 1995 to June 2004, she worked as a heating plant technician assigned to the Authority's South Jamaica Houses development. As such, she was responsible for maintaining the development's heating system.

The pro se plaintiff commenced this action in August 2001. After converting defendants' dismissal motion to one for summary judgment, Justice Louise Gruner Gans dismissed the claims asserted under title VII of the federal Civil Rights Act of 1964 (as amended), and otherwise granted plaintiff's motion for leave to amend the complaint. In the 2003 amended complaint, plaintiff alleged that defendants engaged in, or permitted, a hostile work environment, disparate treatment on the basis of sex, and retaliation, all in violation of Executive Law § 296 (1) (a); (6) and (7) and Administrative Code of the City of NY § 8-107 (1) (a); (6) and (7).

Plaintiff alleged she was sexually harassed in January 1997, when her supervisor allegedly told her, after she had requested facilities to take a shower, "You can take a shower at my house." Plaintiff alleged a second incident on October 21, 1998, where sex-based remarks were made in her presence, although not directed at her. Plaintiff interpreted some of those remarks as being complimentary to a coworker, and a disparaging reference to the supervisor's own wife.

For her disparate treatment claim, plaintiff alleged that her supervisor denied her tools that she needed for her work, preferred (higher paying) shifts, and some training, all during her probationary year (i.e., no later than 1996). Plaintiff acknowledges that she was ultimately permitted to work the preferred shifts when they were vacated by employees of longer standing. She also alleged that she was denied two training opportunities in 2001. The record reflects that plaintiff did participate in other substantial training throughout her tenure.

Plaintiff asserted that she was retaliated against after making complaints about discriminatory treatment. She alleges that in

August 1999 she had to do work outside of her regular duties; specifically, she was required to strip and wax the boiler room office floor, a task that she completed in two regular workdays. Plaintiff also asserted that in August 2001, she was required to perform work in the field and to respond to tenant complaints, work she claimed was customarily given to utility staff. She alleged that a 2002 incident of retaliation consisted of her supervisor's refusal to permit her to take "excused time" to resolve a parking ticket she had received.

Plaintiff was promoted in June 2004 to become an assistant superintendent.

In August 2007, the court (Michael D. Stallman, J.) granted defendants' motion for summary judgment dismissing the amended complaint in its entirety (2007 NY Slip Op 34401[U]). The sexual harassment claim was dismissed on the basis that the conduct complained of was not "severe or pervasive." (*Id.* at *4.)

On the disparate treatment claim, the court found the allegations from plaintiff's probationary year were time-barred because they were not part of a continuing pattern of discriminatory conduct. It also found that plaintiff had attended at least nine one- or two-day training courses, and did not allege that she suffered any injury as a result of not attending more. Finally, it found that plaintiff accepted a promotion offered in May 2004, and had not claimed that she would have been promoted earlier had she taken more classes. The court characterized the disparate treatment claim as missing the necessary element of an "adverse employment action." (*Id.* at *5.)

Evaluating the retaliation claim, the court found that a one-time assignment to perform a task arguably within plaintiff's duties did not constitute retaliation, and that the other claims did not involve being treated differently from workers who had not complained.

We agree with the court's analysis as it pertains to plaintiff's state claims under the Executive Law. The decision dismissing the action failed, however, to properly construe plaintiff's claims under the Restoration Act,[1] which mandates that courts be sensitive to the distinctive language, purposes, and method of analysis required by the City Human Rights Law (City HRL), requiring an analysis more stringent than that called for under either title VII or the State Human Rights Law (State HRL). In

---

1. *See* 2005 NY City Legis Ann, at 528-535.

light of this explicit legislative policy choice by the City Council, we separately analyze plaintiff's City HRL claims.

## I. Requirements and Purposes of the Restoration Act

While the Restoration Act amended the City HRL in a variety of respects,[2] the core of the measure was its revision of Administrative Code § 8-130, the construction provision of the City HRL:

> "The provisions of this [chapter] *title* shall be construed liberally for the accomplishment of the *uniquely broad and remedial* purposes thereof, *regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed*." (Local Law 85 § 7 [deleted language in brackets, new language emphasized].)

As a result of this revision, the City HRL now explicitly requires an independent liberal construction analysis in all circumstances, even where state and federal civil rights laws have comparable language. The independent analysis must be targeted to understanding and fulfilling what the statute characterizes as the City HRL's "uniquely broad and remedial" purposes, which go beyond those of counterpart state or federal civil rights laws.

Section 1 of the Restoration Act amplifies this message. It states that the measure was needed because the provisions of the City HRL had been "construed too narrowly to ensure protection of the civil rights of all persons covered by the law." It goes on to mandate that provisions of the City HRL be interpreted "independently from similar or identical provisions of New York state or federal statutes." (*Id.*) Taking sections 1 and 7 of the Restoration Act together, it is clear that interpretations of state or federal provisions worded similarly to City HRL provisions may be used as aids in interpretation only to the extent that the counterpart provisions are viewed "as a floor below which the City's Human Rights law cannot fall, rather

---

**2.** These include reemphasizing the breadth of the anti-retaliation requirement, discussed infra, in part II. Other provisions include creating protection for domestic partners, increasing civil penalties for claims brought administratively, restoring attorney's fees for "catalyst" cases, and requiring thoroughness in administrative investigations conducted by the New York City Human Rights Commission.

than a ceiling above which the local law cannot rise" (§ 1), and only to the extent that those state or federal law decisions may provide guidance as to the "uniquely broad and remedial" provisions of the local law (§ 7).

The Committee Report accompanying the legislation likewise states that the intent of the Restoration Act was to "ensure construction of the City's human rights law in line with the purposes of fundamental amendments to the law enacted in 1991," and to reverse the pattern of judicial decisions that had improvidently "narrowed the scope of the law's protections" (Rep of Comm on Gen Welfare, 2005 NY City Legis Ann, at 536).

The City Council's debate on the legislation made plain the Restoration Act's intent and consequences:

> "Insisting that our local law be interpreted broadly and independently will safeguard New Yorkers at a time when federal and state civil rights protections are in jeopardy. There are many illustrations of cases, like *Levin* on marital status, *Priore*[,] *McGrath* and *Forrest* that have either failed to interpret the City Human Rights Law to fulfill its uniquely broad purposes, ignore [*sic*] the text of specific provisions of the law, or both. With [the Restoration Act], these cases and others like them, will no longer hinder the vindication of our civil rights."[3]

In other words, the Restoration Act notified courts that (a) they had to be aware that some provisions of the City HRL were textually distinct from its state and federal counterparts, (b) *all* provisions of the City HRL required independent construction to accomplish the law's uniquely broad purposes,[4]

---

**3.** Statement of Annabel Palma at the meeting of the NY City Council (Sept. 15, 2005, transcript at 41). Council Member Palma was a member of the Committee on General Welfare that had brought the bill to the floor of the Council. Committee Chairman Bill deBlasio emphasized that "localities have to stand up for their own visions" of "how we protect the rights of the individual," regardless of federal and state restrictiveness (transcript at 47). Council Member Gale Brewer, the chief sponsor of the Restoration Act, reiterated the comments of Palma and deBlasio, and the importance of making sure that civil rights protections "are stronger here than [under] the State or federal law" (transcript at 48-49). (Transcript on file with NY City Clerk's Office and NY Legislative Service.)

**4.** The City Council in amending Administrative Code § 8-130 could have mandated that "some" provisions of the law be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof" or that

and (c) cases that had failed to respect these differences were being legislatively overruled.

There is significant guidance in understanding the meaning of the term "uniquely broad and remedial." For example, in telling us that the City HRL is to be interpreted "in line with the purposes of the fundamental amendments to the law enacted in 1991," the Council's committee was referring to amendments[5] that were

> "consistent in tone and approach: every change either expanded coverage, limited an exemption, increased responsibility, or broadened remedies. In case after case, the balance struck by the Amendments favored victims and the interests of enforcement over the claimed needs of covered entities in ways materially different from those incorporated into state and federal law."[6]

The Council directs courts to the key principles that should guide the analysis of claims brought under the City HRL:

> "discrimination should not play a role in decisions made by employers, landlords and providers of public accommodations; traditional methods and principles of law enforcement ought to be applied in the civil rights context; and victims of discrimination suffer serious injuries, for which they ought to receive full compensation" (Committee Report, 2005 NY City Legis Ann, at 537).

In short, the text and legislative history represent a desire that the City HRL "meld the broadest vision of social justice with the strongest law enforcement deterrent."[7] Whether or not

---

"new" provisions of the law be so construed. The Council instead made the "shall construe" language applicable to "[t]he provisions of this title" without limitation.

5. Local Law No. 39 (1991) of City of NY.

6. (Professor Craig Gurian, *A Return to Eyes on the Prize: Litigating under the Restored New York City Human Rights Law,* 33 Fordham Urb LJ 255, 288 [2006].) The article—described elsewhere as "an extensive analysis of the purposes of the Local Civil Rights Restoration Act, written by one of the Act's principal authors" (*Ochei v Coler/Goldwater Mem. Hosp.,* 450 F Supp 2d 275, 283 n 1 [SD NY 2006])—summarizes some of the dramatic changes of the 1991 Amendments (*see* Gurian at 283-288).

7. (Gurian, *A Return to Eyes on the Prize,* 33 Fordham Urb LJ at 262.) This is consistent with statements and testimony of the Association of the Bar of the City of NY (letter dated Aug. 1, 2005), the Brennan Center for Justice at New York University School of Law (July 8, 2005), and the Anti-

that desire is wise as a matter of legislative policy, our judicial function is to give force to legislative decisions.[8]

As New York's federal and state trial courts begin to recognize the need to take account of the Restoration Act, the application of the City HRL as amended by the Restoration Act must become the rule and not the exception.[9]

## II. Retaliation

In 1991, the anti-retaliation provision of the City HRL (Administrative Code § 8-107 [7])—which had been identical to

Discrimination Center of Metro New York, Inc. (Apr. 14, 2005), all on file with the Committee on General Welfare and the NY Legislative Service, each confirming that the Council sought to have courts maximize civil rights protections. For example, the Bar Association, at page 4 of its letter, referred to "the Council's clear intent to provide the greatest possible protection for civil rights." At the Council's debate prior to passage, Council Member Palma described the Bar Association and Brennan Center statements as important to the Committee, and characterized the Anti-Discrimination Center's testimony as "an excellent guide to the intent and consequences of [the] legislation we pass today." (Transcript at 41.)

8. We note in this context two cardinal rules of statutory construction: that legislative amendments are "deemed to have intended a material change in the law" (McKinney's Cons Laws of NY, Book 1, Statutes § 193 [a]), and that "courts in construing a statute should consider the mischief sought to be remedied by the new legislation, and they should construe the act in question so as to suppress the evil and advance the remedy" (*id.* § 95). As such, we are not free to give force to one section of the law that has specifically been amended (*e.g.* Administrative Code § 8-107 [7]) and decline to give force to another (*e.g.* § 8-130). We must give force to all amendments, and not relegate any of them to window dressing.

9. *See e.g. Selmanovic v NYSE Group, Inc.*, 2007 WL 4563431, *4-6, 2007 US Dist LEXIS 94963, *9-20 (SD NY) (recognizing the Restoration Act's enhanced liberal construction requirement, and its impact on sexual harassment and retaliation claims under the local law); *Pugliese v Long Is. R.R. Co.*, 2006 WL 2689600, *12-13, 2006 US Dist LEXIS 66936, *38-40 (ED NY) (identifying Administrative Code § 8-107 [13] [b] [1] as the city law's explicit statutory basis for imposing vicarious liability on those exercising managerial or supervisory authority, and noting that "the breadth and scope of CHRL will often yield results different from Title VII" [2006 WL 2689600 at *13, 2006 US Dist LEXIS 66936 at *40]); *Okayama v Kintetsu World Express (U.S.A.) Inc.*, 2008 NY Slip Op 31691(U) (Sup Ct, NY County) (holding that the explicit statutory structure of Administrative Code § 8-107 [13] [b] precludes the availability of the federal *Faragher* affirmative defense where the conduct of those exercising managerial or supervisory authority is at issue); *Farrugia v North Shore Univ. Hosp.*, 13 Misc 3d 740, 747 (2006) (noting that "The New York City Human Rights Law was intended to be more protective than the state and federal counterparts"); *Bumpus v New York City Tr. Auth.*, 18 Misc 3d 1131(A), 2008 NY Slip Op 50254(U), *3 (noting that "The legislative history contemplates that the Law be independently construed with the aim of making it the most progressive in the nation").

the State HRL provision—was amended in pertinent part to proscribe retaliation *"in any manner"* (Local Law No. 39 [1991] of City of NY § 1). If courts were to construe this language to make actionable only conduct that has caused a materially adverse impact on terms and conditions of employment, it would constitute a significant narrowing of the Council's proscription on retaliation "in any manner." However, courts have consistently engaged in this construction. Therefore, the City Council was determined, via the Restoration Act of 2005, to

> "make clear that the standard to be applied to retaliation claims under the City's human rights law differs from the standard currently applied by the Second Circuit in [title VII] retaliation claims . . . [and] is in line with the standard set out in the guidelines of the Equal Employment Opportunity Commission" (Committee Report, 2005 NY City Legis Ann, at 536).

In section 8 (D) (3) of its Compliance Manual (1998), dealing with the subject of retaliation, the Equal Employment Opportunity Commission (EEOC) indicates that the

> "broad view of coverage accords with the primary purpose of the anti-retaliation provisions, which is to '[m]aintain[ ] unfettered access to statutory remedial mechanisms.' Regardless of the degree or quality of harm to the particular complainant, retaliation harms the public interest by deterring others from filing a charge. An interpretation of Title VII that permits some forms of retaliation to go unpunished would undermine the effectiveness of the EEO statutes and conflict with the language and purpose of the anti-retaliation provisions" (citations omitted).[10]

To accomplish the purpose of giving force to the earlier proscription on retaliation "in any manner," the Restoration Act amended section 8-107 (7) to emphasize that

> "[t]he retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment, housing or a public accommodation or in a materially adverse

---

**10.** The Committee Report cited, inter alia, *Ray v Henderson* (217 F3d 1234, 1241-1243 [9th Cir 2000]) to help illustrate the broad sweep of the reemphasized city anti-retaliation provision.

change in the terms and conditions of employment, housing, or a public accommodation, provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity."

In assessing retaliation claims that involve neither ultimate actions nor materially adverse changes in terms and conditions of employment, it is important that the assessment be made with a keen sense of workplace realities, of the fact that the "chilling effect" of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct in light of those realities.[11] Accordingly, the language of the City HRL does not permit any type of challenged conduct to be categorically rejected as nonactionable. On the contrary, no challenged conduct may be deemed nonretaliatory before a determination that a jury could not reasonably conclude from the evidence that such conduct was, in the words of the statute, "reasonably likely to deter a person from engaging in protected activity."[12]

■ Turning to the retaliation claims, it is clear that even under this broader construction, plaintiff's claim that her assignment to strip and wax the boiler room office floor did not constitute retaliation. It is certainly possible for a jury to conclude that someone would be deterred from making a complaint if knowing that doing so might result in being assigned to duties outside or beneath one's normal work tasks. However, an examination of this record shows conclusively that plaintiff cannot link her complained-of assignment to a retaliatory motivation. The same allegedly "out of title" work was given to noncomplaining employees for whom the work was not normally part of the job.

---

**11.** See discussion in *A Return to Eyes on the Prize* (33 Fordham Urb LJ at 321-322).

**12.** Subsequent to passage of the Restoration Act, the U.S. Supreme Court modified the title VII anti-retaliation standard (*Burlington N. & S. F. R. Co. v White*, 548 US 53 [2006]). In doing so, however, *Burlington* still spoke in terms of "material adversity," i.e., conduct that might have dissuaded a reasonable worker from making or supporting a charge of discrimination (*id.* at 68 [emphasis omitted]). While this was a standard similar to that set forth in section 8-107 (7), it cannot be assumed that cases citing *Burlington* adequately convey the full import of the City HRL standard, especially because the confusing use of the term "materially adverse" might lead some courts to screen out some types of conduct *prior* to conducting "reasonably likely to deter" analysis. In fact, to reiterate, section 8-107 (7) specifically rejects a materiality requirement.

Although not raised expressly on appeal by the pro se plaintiff, her other retaliation claims are similarly unavailing. Her assignment to do field work and respond to tenant complaints did not represent a difference in treatment attributable to retaliation, since the record shows that other workers (who did not complain of discrimination) were given similar assignments. The failure to grant plaintiff "excused time" to deal with a parking ticket also did not represent a difference in treatment from workers who did not complain of discrimination.[13] Accordingly, plaintiff's retaliation claim must fail.

## III. Continuing Violations

In *National Railroad Passenger Corporation v Morgan* (536 US 101 [2002]), the Supreme Court established that for federal law purposes, the "continuing violation" doctrine only applied to harassment claims as opposed to claims alleging "discrete" discriminatory acts. At the time the comprehensive 1991 Amendments to the City HRL were enacted, however, federal law in the Second Circuit did not so limit continuing violation claims (*see e.g. Acha v Beame*, 570 F2d 57, 65 [2d Cir 1978] [holding that a continuing violation would exist if there had been a continuing policy that "limited opportunities for female participation" in the work force, including policies related to "hiring, assignment, transfer, promotion and discharge"]; *see also Cornwell v Robinson*, 23 F3d 694, 703-704 [2d Cir 1994] [reaffirming the vitality of the continuing violation doctrine where there had been a consistent pattern of discriminatory hiring practices]). There is no reason to believe that the Supreme Court's more restrictive rule of 2002 was anticipated when the City HRL was amended in 1991, or even three years after that ruling, when the Restoration Act was passed in 2005.[14] On the contrary, the Restoration Act's uniquely remedial provi-

---

**13.** There is no evidence in the record to suggest that in the circumstances presented, the failure to grant such time off was an act reasonably likely to deter a person from engaging in protected activity.

**14.** See, for example, the statement of then-Mayor Dinkins in connection with the signing of the 1991 Amendments, quoted in the 2005 Committee Report, that "there is no time in the modern civil rights era when vigorous local enforcement of anti-discrimination laws has been more important. Since 1980, the federal government has been marching backward on civil rights issues" (Committee Report, 2005 NY City Legis Ann, at 536). This desire for enhanced liberal construction was directly resisted in *McGrath v Toys "R" Us, Inc.* (3 NY3d 421 [2004]), a case in which a narrow, post-1991 interpretation of federal law was transplanted into the Administrative Code without Council action (Committee Report at 537). Indeed, one motivation expressed by the

sions are consistent with a rule that neither penalizes workers who hesitate to bring an action at the first sign of what they suspect could be discriminatory trouble nor rewards covered entities that discriminate by insulating them from challenges to their unlawful conduct that continues into the limitations period. The continuing violation doctrine is discussed in the specific context of plaintiff's sexual harassment and disparate treatment claims, infra, at parts IV and V, respectively.

## IV. Sexual Harassment

In 1986 the Supreme Court ruled, for federal law purposes, that sexual harassment must be "severe or pervasive" before it could be actionable (*Meritor Savings Bank, FSB v Vinson*, 477 US 57, 67 [1986]).[15] The "severe or pervasive" rule has resulted in courts "assigning a significantly lower importance to the right to work in an atmosphere free from discrimination" than other terms and conditions of work.[16] The rule (and its misapplication) has routinely barred the courthouse door to women who have, in fact, been treated less well than men because of gender.[17]

Before the Restoration Act, independent development of the City HRL was limited by the assumption that decisions interpreting federal law could safely be imported into local human rights law because, it was said, any broad anti-discrimination policies embodied in state or local law are "*identical* to those underlying the federal statutes" (*McGrath*, 3 NY3d at 433 [emphasis added]). If the City Council had wanted to depart from a federal doctrine, *McGrath* stated, it should have

Committee for passing the Restoration Act was that construction of numerous provisions of the City HRL "narrowed the scope of the law's protections" (*id.* at 536). *McGrath* was specifically identified on the floor of the Council as a case inconsistent with the requirements of the Restoration Act (*see* Council Member Palma's statement preceding footnote 3, *supra*).

15.    Although the assumption has been that such a rule applies to the City HRL (see, for example, the recent case of *Gallo v Alitalia-Linee Aeree Italiane-Societa per Azione* [585 F Supp 2d 520, 536-537 (SD NY 2008)]), the fact is that "severe or pervasive" was not the accepted City HRL rule at the time of the 1991 Amendments (see discussion in *A Return to Eyes on the Prize* [33 Fordham Urb LJ at 300-301]). Moreover, there is no evidence that "severe or pervasive" has ever been subjected to liberal construction analysis, let alone the enhanced analysis required by the Restoration Act.

16.    Judith J. Johnson, *License to Harass Women: Requiring Hostile Environment Sexual Harassment to be "Severe or Pervasive" Discriminates among "Terms and Conditions" of Employment*, 62 Md L Rev 85, 87 (2003).

17.    *Id.* at 111-134 (describing a variety of techniques by which claims have been turned away using "severe or pervasive" as a shield for discriminators).

amended the law to rebut that doctrine specifically (*id.* at 433-434). The City Council responded to the premise set forth in *McGrath*, legislatively overruling *McGrath* by amending the construction provision of Administrative Code § 8-130, and putting to an end this view of the City HRL as simply mimicking its federal and state counterparts.[18] By making a specific textual amendment to the construction provision (something not done in 1991), the Council formally and unequivocally rejected the assumption that the City HRL's purposes were identical to those of counterpart civil rights statutes. In its place, the Council instructed the courts—reflected in text and legislative history—that it wanted the City HRL's provisions to be construed *more broadly than federal civil rights laws and the State HRL*, and wanted the local law's provisions to be construed as *more remedial than federal civil rights laws and the State HRL* (Administrative Code § 8-130 [as amended by Local Law No. 85 [2005] § 7]).

The Council saw the change to section 8-130 as the means for obviating the need for wholesale textual revision of the myriad specific substantive provisions of the law. While the specific *topical* provisions changed by the Restoration Act give unmistakable *illustrations* of the Council's focus on broadening coverage, section 8-130's specific *construction* provision required a "process of reflection and reconsideration" that was intended to allow independent development of the local law "in all its dimensions" (*A Return to Eyes on the Prize*, 33 Fordham Urb LJ at 280).[19]

Accordingly, we first identify the provision of the City HRL we are interpreting and then ask, as required by the City

---

**18.** (*See* Committee Report, 2005 NY City Legis Ann, at 537.) Importantly, the way that the Council responded to *McGrath* was not by dealing with the specific topic of the case (the availability of attorney's fees in circumstances where only nominal damages are awarded), but by changing the method of analysis applicable to *all* provisions of the law. *McGrath*, of course, was also explicitly mentioned on the floor of the City Council as one of the cases that, with the passage of the Restoration Act, would—in Council Member Palma's words—"no longer hinder the vindication of our civil rights" (see text preceding footnote 3, *supra*). In light of the foregoing, it is puzzling that *Gallo* would make the identical Council "could have done so" argument already specifically rejected by the Restoration Act (*see* 585 F Supp 2d at 537).

**19.** See also page 4 of the Bar Association letter (*supra* at footnote 7), reciting the expectation that the undoing of narrow construction of the law by legislative amendment "should no longer be necessary" if there is judicial appreciation for the Restoration Act's intention that the law provide "the greatest possible protection for civil rights," and page 5 of the Brennan Center statement (same footnote), noting the suggestion that

Council: What interpretation "would fulfill the uniquely broad and remedial purposes of the City's human rights law"?[20] Despite the popular notion that "sex discrimination" and "sexual harassment" are two distinct things, it is, of course, the case that the latter is one species of sex- or gender-based discrimination. There is no "sexual harassment provision" of the law to interpret; there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based, inter alia, on gender (Administrative Code § 8-107 [1] [a]).[21]

As applied in the context of sexual harassment, therefore, the relevant question is what constitutes inferior terms and conditions based on gender. One approach would be to import the "severe or pervasive" test, a rule that the Supreme Court has characterized as "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury" (*Harris v Forklift Systems, Inc.*, 510 US 17, 21 [1993]). This "middle path," however, says bluntly that a worker whose terms and conditions of employment include being on the receiving end of all unwanted gender-based conduct (except what is severe or pervasive) is experiencing essentially the same terms and condi-

---

"a better approach would be for the Council to limit itself to specifically overruling individual interpretations that it views as unduly restrictive. However, this approach has proven ineffective in the past, as the courts have tended to construe narrowly specific Council amendments. Without an explicit instruction that the City Human Rights Law should be construed independently, courts will continue to weaken New York City's Law with restrictive federal and state doctrines."

**20.** See Committee Report (2005 NY City Legis Ann, at 538 n 8). See also page 4 of the Bar Association letter (*supra* at footnote 7) that construction must flow from "the Council's clear intent to provide the greatest possible protection for civil rights," and page 6 of the Anti-Discrimination Center testimony (same footnote) that "[i]n the end, regardless of federal interpretations, the primary task of [a] judge hearing a City Human Rights Law claim is to find the interpretation for the City law that most robustly further[s] the purposes of the City statute."

**21.** The fact that title VII has language similar to that of the City HRL does not even begin our inquiry, let alone end it. The Restoration Act made clear, with specific statutory language, that the obligation to determine what interpretation best fulfills the city law's purposes is in no way limited by the existence of cases that have interpreted analogous federal civil rights provisions (Administrative Code § 8-130; *cf. Gallo* [where the court apparently believed there was something called "the hostile work environment law" (585 F Supp 2d at 538), but never asked what interpretation of section 8-107 (1) (a)'s "terms (and) conditions" language would best fulfill the uniquely broad and remedial purposes of the City HRL]).

tions of employment as the worker whose employer has created a workplace free of unwanted gender-based conduct.

Twenty-two years after *Meritor* (477 US 57 [1986]), it is apparent that the two workers described above do not have the same terms and conditions of employment. Experience has shown that there is a wide spectrum of harassment cases falling between "severe or pervasive" on the one hand and a "merely" offensive utterance on the other.[22] The City HRL is now explicitly designed to be broader and more remedial than the Supreme Court's "middle ground," a test that had sanctioned a significant spectrum of conduct demeaning to women. With this broad remedial purpose in mind, we conclude that questions of "severity" and "pervasiveness" are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability (*Farrugia*, 13 Misc 3d at 748-749).

In doing so, we note that the "severe or pervasive" test reduces the incentive for employers to create workplaces that have zero tolerance for conduct demeaning to a worker because of protected class status. In contrast, a rule by which liability is normally determined simply by the existence of differential treatment (i.e., unwanted gender-based conduct) maximizes the law's deterrent effect. It is the latter approach—maximizing deterrence—that incorporates "traditional methods and principles of law enforcement," one of the principles by which our analysis must be guided (Committee Report, 2005 NY City Legis Ann, at 537). Permitting a wide range of conduct to be found beneath the "severe or pervasive" bar would mean that discrimination is allowed to play *some significant role* in the workplace. Both Administrative Code § 8-101 and the Committee Report accompanying the Restoration Act say the analysis of the City HRL must be guided by the need to make sure that discrimination plays *no* role (2005 NY City Legis Ann, at 537), a principle again much more consistent with a rule by which liability is normally determined simply by the existence of unwanted gender-based conduct. Finally, the "severe or pervasive" doctrine, by effectively treating as actionable only a small subset of workplace actions that demean women or members of other protected classes, is contradicted by the Res-

---

**22.** It would be difficult to find a worker who viewed a job where she knew she would have to cope with unwanted gender-based conduct (except what is severe or pervasive) as equivalent to one free of unwanted gender-based conduct.

toration Act principle that the discrimination violations are per se "serious injuries" (*id.*).[23] Here again, a focus on differential treatment better serves the purposes of the statute.

Further evidence in the legislative history precludes making the standard for sexual harassment violations a carbon copy of the federal and state standard. The City HRL's enhanced liberal construction requirement was passed partly in recognition of multiple complaints that a change to section 8-130 was necessary to prevent women from being hurt by the unduly restrictive "severe or pervasive" standard. The Council had been told that the "severe or pervasive" standard "continuously hurts women" and "means that many victims of sexual harassment may never step forward."[24] Likewise, the Council was told that "without any consideration of what standard would best fur-

---

**23.** As already noted, the fact that conduct is actionable does not control the amount of damages to be awarded.

**24.** (Kathryn Lake Mazierski, President, New York State Chapter of the National Organization for Women, testimony at hearing of the City Council's Committee on General Welfare, at 49-50 [Sept. 22, 2004] [NOW testimony, transcript on file with NY City Clerk's Office]). Note that *Gallo* asserts that organizations sought to have the "severe and pervasive" test "removed" from the City HRL, that the Council "ignored" that suggestion and "amended only those specific portions of the CHRL that the City thought needed to be addressed," and that Professor Gurian's article supports that account (585 F Supp 2d at 537). In so stating, *Gallo* ignores the legislative history and mischaracterizes the article. In fact, as discussed *supra*, the most important specific textual changes made by the Council were the changes to section 8-130—changes designed to control the construction of every other provision of the HRL, and so important that they were doubly emphasized in section 1 of the Restoration Act. Contrary to *Gallo*, neither the New York Chapter of NOW nor any of the other organizations that spoke to this issue had argued that the City Council should revise the text of section 8-107 (1) (a)'s terms and conditions provision to proscribe the "no severe or pervasive" limitation, and the Council made no decision to "adopt" the "severe or pervasive" rule. Instead, the organizations all raised the issue as part of their (successful) advocacy to have the language of section 8-130 changed. For example, Ms. Mazierski, after describing the "problem of hitching the local law to a federal standard" (NOW testimony at 47), argued for an enhanced liberal construction provision: "If judges are forced to look at a proper standard for sexual harassment claims under the City's Human Rights Law, independent [of] the federal standard, *we will be able to have an argument on the merits and not be stuck on the standard that continuously hurts women*" (*id.* at 50 [emphasis added]). As for Professor Gurian's article, it set forth the decision that the City Council actually made, describing the enhanced liberal construction provision as the Restoration Act's "declaration of independence," and noting that areas of law that have been settled by virtue of interpretations of federal or

ther the purposes of the City Law, women who have been sexually harassed are routinely thrown out of court without getting a chance to have a jury hear their claims because a judge uses the federal standard that they have not been harassed enough"[25] and that "[w]e have long had the problem of judges insisting that harassment [has] to be 'severe or pervasive' before it is actionable, even though such a requirement unduly narrows the reach of the law."[26]

For HRL liability, therefore, the primary issue for a trier of fact in harassment cases, as in other terms and conditions cases, is whether the plaintiff has proven by a preponderance of the evidence that she has been treated less well than other employees because of her gender. At the summary judgment stage, judgment should normally be denied to a defendant if there exist triable issues of fact as to whether such conduct occurred (Administrative Code § 8-107 [1] [a]; *see Farrugia*, 13 Misc 3d at 748-749 ["Under the City's law, liability should be determined by the existence of unequal treatment, and questions of severity and frequency reserved for consideration of damages" (quoted in *Selmanovic*, 2007 WL 4563431 at *4, 2007 US Dist LEXIS 94963 at *11)]).[27]

*Farrugia* was recently criticized in *Gallo* for its focus on " 'unequal' treatment," the latter decision insisting that the "severe or pervasive" restriction be applied to City HRL claims just as the restriction is applied to title VII and State HRL claims (585 F Supp 2d at 537). We conclude that the criticism simply does not recognize the City HRL's broader remedial purpose. The *Gallo* decision states:

> "A single instance of 'unequal' treatment (between, say, a man and woman or a homosexual and heterosexual) can constitute 'discrimination,' but may not qualify as 'harassment' of the sort needed to create

state law "will now be reopened for argument and analysis. . . . As such, advocates will be able to argue afresh (or for the first time) a wide range of issues under the City's Human Rights Law, including the parameters of actionable sexual harassment" (*A Return to Eyes on the Prize*, 33 Fordham Urb LJ at 258).

**25.** Brennan Center statement (*supra* at footnote 7) at page 5.

**26.** Anti-Discrimination Center testimony (*supra* at footnote 7) at page 2.

**27.** In the "mixed motive" context, of course, the question on summary judgment is whether there exist triable issues of fact that discrimination was one of the motivating factors for the defendant's conduct. Under Administrative Code § 8-101, discrimination shall play no role in decisions relating to employment, housing or public accommodations.

a hostile work environment. If inequality of treatment were all that the hostile work environment law required, hostile work environment and discrimination claims would merge." (*Id.* at 537-538.)

In other words, the *Gallo* court begins with the premise that it is necessary to maintain the distinction that current federal law makes between non-harassment sex discrimination claims on the one hand (where a permissive standard is applied) and sex discrimination claims based on harassment (where "hostile work environment" is the term of art describing the application of a restrictive standard). Contrary to the assumption embedded in *Gallo*,[28] the task under the City HRL, as amended by the Restoration Act, is not to ask "Would a proposed interpretation differ from federal law?" but rather "How differently, if at all, should harassment and non-harassment sex discrimination cases be evaluated to achieve the City HRL's uniquely broad and remedial purposes?"[29]

As discussed above, we conclude that a focus on unequal treatment based on gender—regardless of whether the conduct is "tangible" (like hiring or firing) or not—is in fact the approach that is most faithful to the uniquely broad and remedial purposes of the local statute. To do otherwise is to permit far too much unwanted gender-based conduct to continue befouling the workplace.

Our task, however, is not yet completed because, while the City HRL has been structured to emphasize the vindication of civil rights over shortcuts that reduce litigation volume, we recognize that the broader purposes of the City HRL do not connote an intention that the law operate as a "general civility code" (*Oncale v Sundowner Offshore Services, Inc.,* 523 US 75, 81 [1998] [discussing title VII]). The way to avoid this result is

---

**28.** Throughout this decision, we have referenced *Gallo* to illustrate types of analyses that have now been rejected by the Restoration Act, but it is important to note that the Restoration Act will require many courts to approach the City HRL with new eyes. It is not that frequent that, as here, legislation is enacted "to remind, empower, and require judges to fulfill their essential role as active and zealous agents for the vindication of the purposes of the law" (*A Return to Eyes on the Prize,* 33 Fordham Urb LJ at 290). Nor are judges often urged by the legislative body to exercise judicial restraint against substituting their own more conservative social policy judgments for the policy judgments made by the Council or treating a local law as merely in parallel with its federal or state counterpart (*id.*).

**29.** *Cf.* Committee Report, 2005 NY City Legis Ann, at 538 n 8 (the Restoration Act "underscores the need for thoughtful, independent consideration of whether the proposed interpretation would fulfill the uniquely broad and remedial purposes of the City's human rights law").

not by adopting *Oncale*'s overly restrictive "severe or pervasive" bar, but by recognizing an affirmative defense whereby defendants can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider "petty slights and trivial inconveniences."

In doing so, we narrowly target concerns about truly insubstantial cases, while at the same time avoiding improperly giving license to the broad range of conduct that falls between "severe or pervasive" on the one hand and a "petty slight or trivial inconvenience" on the other. By using the device of an affirmative defense, we recognize that, in general, "a jury made up of a cross-section of our heterogeneous communities provides the appropriate institution for deciding whether borderline situations should be characterized as sexual harassment and retaliation" (*Gallagher v Delaney*, 139 F3d 338, 342 [2d Cir 1998]). At the same time, we assure employers that summary judgment will still be available where they can prove that the alleged discriminatory conduct in question does not represent a "borderline" situation but one that could only be reasonably interpreted by a trier of fact as representing no more than petty slights or trivial inconveniences.

In the instant case, the complaint was filed in August 2001. As such, actions that occurred prior to August 1998 would normally be barred except if the continuing violation doctrine applies. During the limitations period, the only harassment allegation supported by evidence that could be credited by a jury consists of comments made in plaintiff's presence on one occasion in October 1998 that were not directed at her, and were perceived by her as being in part complimentary to a coworker. These comments were, in view of plaintiff's own experience and interpretation, nothing more than petty slights or trivial inconveniences, and thus are not actionable.[30]

Prior to the limitations period, the record does reflect the inappropriate comment about taking a shower, made in January 1997 (i.e., 19 months before the start of the limitations period). Since this pre-limitations period comment was not joined to ac-

---

**30.** One can easily imagine a single comment that objectifies women being made in circumstances where that comment would, for example, signal views about the role of women in the workplace and be actionable. No such circumstances were present here.

tionable conduct within the limitations period,[31] the continuing violation doctrine does not render the complaint about the January 1997 comment timely. Accordingly, plaintiff's sexual harassment claims must fail.

## V. Other Disparate Treatment Claims

Plaintiff's allegations regarding not initially being provided with necessary tools and not being assigned to more desirable work-shift assignments refer to conduct in 1995 and 1996. The absence of any problem for at least 20 months prior to the start of the limitations period does not evidence a "consistent pattern," and in any event, there is no connection to actionable conduct during the limitations period. Plaintiff does not show differences in treatment with male workers in the limitations period; like other workers, she received substantial training.[32] It is thus unnecessary to reach the issue of the "materiality" of these non-harassment claims.[33]

Accordingly, the order of Supreme Court, New York County (Michael D. Stallman, J.), entered August 14, 2007, which granted defendants summary judgment dismissing the amended complaint, should be affirmed, without costs.

ANDRIAS, J.P. (concurring in the result only). Because my learned colleagues insist on addressing and deciding an issue that was raised neither below nor on appeal, I would affirm for the reasons stated by the motion court which, in pertinent part, properly dismissed plaintiff's claim for retaliation upon a finding that a one-time assignment to strip and wax the boiler room floor—a task that was, at least arguably, a part of her duties—did not constitute retaliation.

---

**31.** The lack of actionable gender-based discrimination in this case (to which a pre-limitations period harassing comment could otherwise be linked) is discussed infra, in part V.

**32.** The record shows that plaintiff was, in fact, absent on two occasions, but complained about being denied training.

**33.** In view of the Restoration Act's rejection of *Forrest v Jewish Guild for the Blind* (3 NY3d 295 [2004]) and *Galabya v New York City Bd. of Educ.* (202 F3d 636 [2d Cir 2000]), two of the cases cited by the court below, that issue would need to be decided afresh with due regard for the commands of the enactment (*see e.g.* Council Member Palma's statement preceding footnote 3, *supra* [that cases like these "will no longer hinder the vindication of our civil rights"]; *see also* Committee Report, 2005 NY City Legis Ann, at 537 [demanding that "discrimination . . . not play a role"], at 538 n 4 [contrasting *Galabya* with the Council's preferred approach to materiality]). However, given the factual circumstances of the instant case, such a determination is not necessary.

Relying upon the Supreme Court's decision in *Burlington N. & S. F. R. Co. v White* (548 US 53, 67-68 [2006]) for its holding that "actionable retaliation" is that which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" (internal quotation marks and citations omitted), plaintiff succinctly argues on appeal that a reassignment of duties can constitute retaliatory discrimination even where both the former and present duties fall within the same job description, that a jury could reasonably conclude the reassignment would have been "materially adverse to a reasonable employee," and that the motion court inappropriately assessed the credibility of the witnesses' statements regarding that assignment.

My colleagues find no merit to plaintiff's arguments and agree with the motion court's analysis as pertinent to plaintiff's State Human Rights Law claim, but take issue with its decision because it failed to construe her claim according to the standard set forth in the Local Civil Rights Restoration Act of 2005. However, neither at nisi prius nor on appeal has plaintiff enunciated a specific claim under the New York City Human Rights Law. Moreover, even if it could be argued that, by amending her verified complaint to add in its introduction that "This is an action pursuant to the New York Executive Law §§ 296 (a) (1) [*sic*], (6), (7) and New York City Administrative Code §§ 8-107 (a) (1) [*sic*], (6), (7), of a hostile work environment and retaliation to vindicate the civil rights of plaintiff," she had actually raised the issue, she clearly has not pursued it on appeal.

The question of whether we should be deciding appeals on the basis of arguments not raised by the parties on appeal has recently become a recurring issue in this Court. It is, however, a fundamental principle of appellate jurisprudence that arguments raised below but not pursued on appeal are generally deemed abandoned, and such arguments, which are therefore not properly before us, should not be considered (*see McHale v Anthony*, 41 AD3d 265, 266-267 [2007]). The rationale for such principle, as expressed by this Court, is that deciding issues not even raised or addressed in the parties' briefs would be so unfair to the parties as to implicate due process concerns (*id.* at 267).

> "By any standard it would be unusual behavior for an appellate court to reach and determine an issue never presented in a litigation, and to do so without providing an opportunity for the adversely affected parties to be heard on a question which they had no

reason to believe was part of the litigation" (*Grant v Cuomo*, 130 AD2d 154, 176 [1987], *affd* 73 NY2d 820 [1988]).

"These principles are not mere technicalities, nor are they only concerned with fairness to litigants, important as that goal is. They are at the core of the distinction between the Legislature, which may spontaneously change the law whenever it perceives a public need, and the courts which can only announce the law when necessary to resolve a particular dispute between identified parties. It is always tempting for a court to ignore this restriction and to reach out and settle or change the law to the court's satisfaction, particularly when the issue reached is important and might excite public interest. However, it is precisely in those cases that the need for judicial patience and adherence to the common-law adversarial process may be—or is often greatest" (*Lichtman v Grossbard*, 73 NY2d 792, 794-795 [1988]).

For my colleagues to adopt a new and supposedly more liberal standard for determining liability under the City's Human Rights Law and to abandon the present, supposedly unduly restrictive, "severe or pervasive" standard in favor of one that "is most faithful to the uniquely broad and remedial purposes of the local statute," without any input from the parties concerned, flies in the face of these well settled principles.

In *A Return to Eyes on the Prize: Litigating under the Restored New York City Human Rights Law* (33 Fordham Urb LJ 255 [2006]), which my colleagues repeatedly cite with approval, the author, who is described as "the principal drafter of the Local Civil Rights Restoration Act" of 2005, complains that the failure of such reforms to achieve their potential is due in significant part to the supposed "unwillingness of judges to engage in an independent analysis of what interpretation of the City Human Rights Law would best effectuate the purposes of that law" (*id*. at 255 n a1, 255-256). However, in the next breath, he states: "In fairness, advocates for victims of discrimination must also take responsibility for the stunted state of City Human Rights Law. On far too many occasions, courts have not been asked to engage in this independent analysis" (*id*. at 256 n 5). That is exactly the case here, and my colleagues' departure from the normal rules governing appellate courts is singularly unwarranted (*see Grant*, 130 AD2d at 176).

Saxe, Gonzalez and Catterson, JJ., concur with Acosta, J.; Andrias, J.P., concurs in the result only in a separate opinion.

Order, Supreme Court, New York County, entered August 14, 2007, affirmed, without costs.