[15 NYS3d 331]

In the Matter of Earl Phillips, Respondent, v Manhattan and Bronx Surface Transit Operating Authority, Appellant.

First Department, August 18, 2015

APPEARANCES OF COUNSEL

*Lewis S. Finkelman*, Brooklyn (*Timothy J. O'Shaughnessy* of counsel), for appellant.

*Advocates for Justice, C.A.*, New York City (*Arthur Z. Schwartz* of counsel), for respondent.

## OPINION OF THE COURT

RENWICK, J.

This case stems from a bus driver's employment termination by the Manhattan and Bronx Surface Transit Operating Authority (Transit Authority) for alleged sexual harassment of a bus dispatcher. The bus operator did not contest the charges or the penalty. Instead, his union challenged the Transit Authority's power to impose the disciplinary penalty of termination against an employee who had been put on union-paid release time prior to the Transit Authority imposing such penalty. The dispute culminated with an arbitration as mandated by the terms of the collective bargaining agreement (CBA) between the union and the Transit Authority. The arbitrator awarded reinstatement of the employee, upon concluding that the employer violated the CBA by seeking to impose discipline upon the employee while he was on approved union-paid release. Supreme Court granted the union's CPLR article 75 petition seeking to confirm the arbitration award reinstating the employee. The issue that we must resolve is whether it was a violation of public policy for the arbitrator to interpret the CBA's approved union-paid release time as a shield for an employee to prevent the Transit Authority from fulfilling its obligation to prevent and sanction sexual harassment in the workplace.

The bus operator, Tony Aiken, is employed by respondent Transit Authority and is represented by the Transport Workers

Union of America, Local 100 (the Union) to collectively bargain, process, and settle disciplinary and contract interpretation grievances arising out of the CBA between the Transit Authority and the Union. The detailed Disciplinary Grievance and Contract Interpretation Grievance procedures, established by the CBA to resolve any disputes arising thereunder, involve multiple steps that culminate in final and binding arbitration. The CBA provides that Disciplinary Grievances and Contract Interpretation Grievances similarly begin with a Step I meeting before the employee's department head, to be followed, if necessary, by a Step II meeting before the Transit Authority's deputy vice-president for labor disputes resolution and then, if necessary, an evidentiary arbitration hearing.

Between February 2011 and January 2013, Aiken worked as a bus operator, referred to as a "shifter," four hours per day, five days a week. Aiken was also a union official and worked eight hours per day on labor-management duties, on Transit Authority-paid release time. In December 2012, a female bus dispatcher filed a complaint with the Transit Authority's Office of Equal Employment Opportunity (EEO), alleging that petitioner had repeatedly sexually harassed her. In response the EEO initiated an investigation.

On January 17, 2013, the Union requested that Aiken be put on union-paid release time, effective January 20. The Transit Authority approved the request, assertedly so as to ensure that Aiken would not have contact with the complainant pending the EEO investigation. On April 12, 2013, the EEO office issued a report in which it found reasonable cause to believe that Aiken had subjected the complainant to inappropriate and unwelcome comments of a sexual nature, in violation of the Transit Authority's sexual harassment policy. The report recommended that the Transit Authority take "appropriate corrective action."

On May 10, 2013, the Transit Authority presented disciplinary charges against Aiken, asserting that he engaged in sexual harassment against the complainant and created a hostile work environment. Aiken did not appear for the Step I Disciplinary Grievance Hearing scheduled for May 15, or for the rescheduled May 22 and 29, 2013 hearing dates. Apparently, Aiken never appeared because the Union disputed the Transit Authority's power to maintain a disciplinary grievance against an employee who was placed on union-paid release time. The Transit Authority imposed the penalty of dismissal effective May 31,

2013. The Transit Authority denied the Union's appeal of the Step I disciplinary determination.

Meanwhile, on May 23, 2013, the parties met the contract grievance arbitrator to discuss issues relating to the disciplinary grievance against Aiken. The contract arbitrator informed the Union that, if it desired him to consider the matter, it would have to file a Contract Interpretation Grievance. On May 29, 2013, the Union filed a Contract Interpretation Grievance, asserting that the Transit Authority cannot discipline an employee who is on union-paid release time. The Union's position was that placement on union-paid release time created a "safe haven" for Aiken, such that the "move to union staff was designed to protect Aiken from discipline." The Authority denied the grievance at Step I and Step II hearings. The contract arbitrator thereafter heard the matter. In an opinion and award dated July 30, 2013, the contract arbitrator found that the Transit Authority had "violated the [CBA] by seeking to impose discipline on Aiken while he was on approved Union paid release time." The arbitrator noted that the CBA (section 1.16) contained specific directives governing prohibited activities for employees on release time, paid or unpaid.

On August 5, 2013, the Union commenced this article 75 proceeding in Supreme Court seeking an order confirming the award reinstating Aiken. The Union asserted that, under blackletter arbitration law, the award should be enforced, because the "grievance arbitration provision was in the contract, the parties agreed to arbitrate the issues, and the arbitrator interpreted the contract and based his decision on actual provisions of the contract." The Transit Authority opposed the petition, and cross-moved for an order dismissing the petition and vacating the award. The Transit Authority contended, inter alia, that, by "preventing [it] from taking prompt action to address sexual harassment in the workplace," the award violated public policy and was subject to vacatur. In opposition to the cross motion, the Union asserted that the award did not violate public policy, pointing to decisions that "upheld arbitration awards which turned away efforts to discharge employees whom the arbitrators found guilty of sexual harassment."

We begin with the recognition that the Transit Authority has a very heavy burden in this case when it seeks to judicially overturn a CBA arbitration award. In rendering the award, the arbitrator exercised powers delegated by the parties. Both the Transit Authority and the Union had bargained for the

arbitrator's construction of the CBA, and they have granted him the authority to interpret the meaning of its language, including the interplay between the Contract Interpretation Grievance and Disciplinary Grievance provisions. Consequently, in considering the issue before us, we must assume that the CBA itself calls for the remedy set forth in the arbitrator's award; the question to be asked is whether the arbitrator's interpretation of the CBA—requiring reinstatement of the sexual harassment offender because the union-paid release time acts as a shield—runs counter to the identified public policy against sexual harassment in the workplace.

The scope of the public policy exception to an arbitrator's power to resolve disputes is extremely narrow, and courts will only intervene in " 'cases in which public policy considerations, embodied in statute or decisional law, prohibit, in an absolute sense, particular matters being decided or certain relief being granted by an arbitrator' " (*Matter of New York City Tr. Auth. v Transport Workers Union of Am., Local 100, AFL-CIO*, 99 NY2d 1, 7 [2002], quoting *Matter of Sprinzen [Nomberg]*, 46 NY2d 623, 631 [1979] [emphasis omitted]). In other words, under this analysis, we must focus on the result only, and can vacate the award if it intrudes into areas reserved for others to resolve; or if, because of its reach, the award violates an explicit law of this State. Moreover, "courts must be able to examine an arbitration . . . award on its face, without engaging in extended factfinding or legal analysis, and conclude that public policy precludes its enforcement" (*Sprinzen*, 46 NY2d at 631).

Despite the narrowness of the public policy exception, judicial deference to arbitration awards in all cases is not appropriate. Although rare, some cases have qualified for judicial intervention under the first prong of the public policy exception. *Matter of Cohoes City School Dist. v Cohoes Teachers Assn.* (40 NY2d 774 [1976]) is an example. *Cohoes* involved a dispute between a teachers' union and a local school board, very much a labor dispute in the public sector, where the courts have been plainly supportive of arbitration (*see e.g. Matter of Associated Teachers of Huntington v Board of Educ., Union Free School Dist. No. 3, Town of Huntington*, 33 NY2d 229, 236 [1973]). The issue in *Cohoes* was whether a board could cede to arbitration its power to determine a teacher's tenure after a probationary period. The Court of Appeals held that public policy precludes delegation of that issue, finding it "inescapably implicit" in the applicable statutes (*see Cohoes* at 778; Education Law §§ 2501, 2509

(2) and (7); 2573, 3012-3013, 6206; Civil Service Law § 200 *et seq.*) that the issue be withheld from the arbitral process, whatever applicability arbitration may have for the realm in general (*Cohoes*, 40 NY2d at 778).

Similarly, some cases have qualified for judicial intervention under the second prong of the public policy exception. *Matter of City of New York v Uniformed Fire Officers Assn., Local 854, IAFF, AFL-CIO* (95 NY2d 273 [2000]) is an example. In *Fire Officers*, the City of New York Department of Investigation (DOI) was conducting an investigation into possible line of duty injury fraud within the fire department (*id.* at 278). The Court of Appeals deemed this to be a criminal investigation. The collective bargaining agreement guaranteed officers the right to a union representative at investigative interviews, the right to prior notice before being questioned, and other protections (*id.* at 278-279). When the City excluded a union representative from an investigatory interview, and failed to give adequate notice of an interview, the union grieved, seeking arbitration and a remedial award requiring the investigators to abide by the contract in its investigation, "to restrict all future DOI investigations involving its members," and to direct the Department to comply "with contractual requirements when noticing and conducting investigations involving members of the UFOA bargaining unit" (*id.* at 285). The union sought a present and future remedy by which the arbitrator would "determine when and how DOI investigations involving UFOA members are to be conducted" (*id.*). The Court of Appeals affirmed the lower courts' stay of the arbitration, citing to section 803 of the New York City Charter, which authorizes the Department of Investigation to investigate "possible criminal conduct and conflicts affecting City agencies or City employees" (*Fire Officers* at 280-282). The Court reasoned that the expansive remedy sought by the UFOA, asking the arbitrator to order the DOI to conduct future criminal investigations only in accordance with the contract rules, would "impinge on DOI's ability to conduct a criminal investigation" (*id.* at 284).

This case does not qualify for judicial intervention under the first prong of the public policy exception. In fact, the parties concede that these disciplinary and contract interpretation grievance proceedings were the proper subject of arbitration. From the onset, the action was litigated, and the rights of the parties determined, under the auspices of the collective bargaining agreement. The collective bargaining agreement reflects the usual proviso regarding arbitration proceedings,

namely that arbitration is the appropriate venue for resolving disciplinary matters.

We do, however, find it necessary to intervene under the second prong of the public policy exception because the arbitrator construed the CBA and fashioned a remedy in a manner that conflicts with a well-defined and dominant public policy. The public policy against sexual harassment in the workplace is well recognized. Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of sex (42 USC § 2000e-2 [a] [1]). The Equal Employment Opportunity Commission (the EEOC), which administers and enforces this provision, has promulgated a guideline that states:

> "Harassment on the basis of sex is a violation of section 703 of title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when . . . such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment" (29 CFR 1604.11 [a] [3]).

Moreover, title VII places upon an employer the responsibility to maintain a workplace environment free of sexual harassment. The EEOC guidelines make employers liable for sexual harassment between fellow employees of which it knew or should have known, "unless it can show that it took immediate and appropriate corrective action" (29 CFR 1604.11 [d]). The EEOC guidelines indicate that employers should take all reasonable steps to prevent harassment from occurring in the employment setting, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under title VII, and developing methods to sensitize all concerned (29 CFR 1604.11 [f]). The EEOC Compliance Manual further provides that employers should create a procedure for resolving sexual harassment complaints that encourages victims of sexual harassment to come forward (*Newsday, Inc. v Long Is. Typographical Union, No. 915, CWA, AFL-CIO*, 915 F2d 840 [2d Cir 1990], *cert denied* 499 US 922 [1991], citing EEOC Policy Guidance: Sexual Harassment, N-915.035 at N:4028). "It should ensure confidentiality as much as possible and provide effective remedies, including protection of victims and witnesses against retaliation" (*id.* at 845).

156

New York has similar legislation and rules (*id.* at 844 n 2, citing Executive Law § 291; New York State Division of Human Rights, New York: Rulings on Pre-Employment Inquiries, 8B State Fair Empl. Prac. Man. (BNA) 455:3151, 3159 [1989]). Furthermore, the protections afforded employees under the New York City Human Rights Law (NYCHRL) are more expansive than those provided under analogous provisions of title VII of the Civil Rights Act of 1964 (*see* Local Law No. 85 [2005] of City of New York, § 7 [revising Administrative Code of City of NY § 8-130]); *see also* Craig Gurian, *A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law*, 33 Fordham Urb LJ 255 [2006]). For instance, in *Williams v New York City Hous. Auth.* (61 AD3d 62 [1st Dept 2009], *lv denied* 13 NY3d 702 [2009]), this Court determined that the "severe or pervasive" standard, which is used under federal and state law to determine whether actionable harassment has occurred, does not apply to claims brought under the NYCHRL. Rather, the new and lower standard to be applied is "whether the plaintiff has proven by a preponderance of the evidence that she has been treated less well than other employees because of her gender" (*Williams*, 61 AD3d at 78).

In this case, the bus driver was accused by his coworker, a bus dispatcher, of serious harassment charges that "created an uncomfortable and hostile work environment for [the dispatcher] and other female employees . . . [and] adversely affected their ability to perform their jobs by making frequent unwelcome, and/or inappropriate comments of a sexual nature to them." These allegations, which the Transit Authority considered serious enough to require Aiken's termination, have gone unchallenged. Aiken did not appear at the Disciplinary Grievance Hearing to confront his accuser and to refute the allegations. Instead, the Union appealed the disciplinary determination through the Contract Interpretation Grievance process which ultimately resulted in the arbitrator agreeing with the Union that the Transit Authority violated the CBA by seeking to impose discipline on Aiken while he was on approved union-paid release time at the time the termination was imposed.

We cannot turn a blind eye to the fact that this interpretation of the CBA and the concomitant remedy of reinstatement conflicts with the sexual harassment policy. Because title VII is designed to encourage the creation of anti-harassment policies

and effective complaint mechanisms for reporting harassing conduct, an employer's investigation of a sexual harassment complaint is not a gratuitous or optional undertaking under federal law, and appropriate corrective action is required following such investigation (*see Mulvihill v Top-Flite Golf Co.*, 335 F3d 15, 21 [1st Cir 2003]). Yet, by ordering reinstatement on the basis of the CBA's approved union-paid release time, the arbitrator effectively precludes the Transit Authority from following its policy and thereby satisfying its legal obligations to protect against sexual harassment in the workplace. If forced to honor the arbitration award, the Transit Authority will not be complying with title VII and the New York State and New York City Human Rights Law, each of which requires that an employer impose appropriate discipline for proven cases of sexual harassment in order to ensure a safe work environment free of sexual harassment.

Accordingly, this is one of the relatively rare cases where a CBA arbitration award—reinstating a sexual harassment offender—runs counter to the strong public policy against sexual harassment in the workplace. If left to stand, the arbitration award will send the wrong message—that certain employees at the Transit Authority, mainly those who also performed union—related activities, may be free to create a sexually-charged atmosphere in the Transit Authority's workplaces because any complaints against them will be impeded by CBA protections. Knowing that complaints against employees like Aiken will be impeded by CBA protections, victims of sexual harassment may hesitate to come forward to report opprobrious behavior, thereby undermining the Transit Authority's ability to promptly remedy such behavior. It is also imperative that employers have the unfettered ability to discipline employees such as Aiken in order to both punish the offender and to deter other employees from engaging in such behavior.

In reaching this result, we do not exceed our narrow power to review an arbitrator's findings of fact or his interpretation of the meaning of the CBA's provisions. Moreover, we do not substitute judicial opinion for the arbitrator's decision in contravention of the parties' CBA. We do not rule on either the merits of the underlying allegations or impose a remedy we feel is appropriate; we simply vacate the award as violative of public policy.

Accordingly, the order of the Supreme Court, New York County (Eileen A. Rakower, J.), entered October 2, 2013, which,

insofar as appealed from, granted the petition to confirm an arbitration award, dated July 30, 2013, to the extent it found that respondent violated the parties' collective bargaining agreement by seeking to impose discipline on petitioner while he was on approved union-paid release time, should be reversed, on the law, without costs, the petition denied, and the cross motion to vacate the award granted.

MAZZARELLI, J.P., SWEENY, FEINMAN and KAPNICK, JJ., concur.

Order, Supreme Court, New York County, entered October 2, 2013, reversed, on the law, without costs, the petition denied, and the cross motion to vacate the award granted.