[885 NYS2d 74]

JOEL VIG, Appellant, v THE NEW YORK HAIRSPRAY CO., L.P., Respondent.

First Department, September 15, 2009

### APPEARANCES OF COUNSEL

*Spizz & Cooper, LLP*, Mineola (*Harvey W. Spizz* of counsel), for appellant.

*Proskauer Rose LLP*, New York City (*Neil H. Abramson* and *Ian C. Schaefer* of counsel), for respondent.

### OPINION OF THE COURT

ACOSTA, J.

This case requires us to evaluate the sufficiency of a complaint alleging disability discrimination under the New York State Human Rights Law (State HRL) (Executive Law art 15) and the New York City Human Rights Law (City HRL) (Administrative Code of City of NY § 8-101 *et seq.*) in the context of a motion to dismiss for failure to state a cause of action.

### Background[1]

Plaintiff was an actor and musician in defendant's production of the hit musical play *Hairspray*. Plaintiff filled multiple roles in the production: the principal, Mr. Spritzer, Mr. Pinky, the policeman, the flasher, and a prison guard. He also served as

---

1. The facts are taken from the amended complaint and plaintiff's affidavit in support of the motion to renew.

understudy for Harvey Fierstein in his role as Edna Turnblad and for Dick Latessa in his role as Wilbur Turnblad. In addition, plaintiff played the glockenspiel as a musician in the production.

Plaintiff fulfilled these duties for defendant pursuant to two written contracts—an Actors' Equity Association contract and a contract with the Associated Musicians of Greater New York (Musicians Union). Defendant requested that plaintiff perform under the additional contract so that it could comply with the Musicians Union's requirement for the minimum number of musicians required for a Broadway production. As a member of the Musicians Union, and pursuant to the collective bargaining agreement between Union Local 802 and the League of American Theatres and Producers, plaintiff was guaranteed employment for the run of the show.

### Factual Allegations Plaintiff's Injury and Medical Leave

Plaintiff alleges that he was injured during the course of his employment when, during the opening musical number of a Wednesday matinee, he fell on stage in front of the audience, banging his right knee and twisting the left. Plaintiff alleges that after he completed the performance, he was evaluated by a physical therapist on call in the theater, who advised him not to continue performing until he consulted with a physician.

Plaintiff alleges he consulted with Dr. Phillip Bauman, the orthopedist recommended by defendant, who referred him for an MRI exam that revealed plaintiff had suffered a tear in the meniscus, the cartilage in his left knee. Plaintiff alleges he was able to resume performing that Saturday night after being advised by the physical therapist that he could perform, but could not twist or jump during the show.

Plaintiff further alleges that during the first week of July 2004, after returning from a one-week vacation, he informed the stage manager that he intended to have surgery to repair the injury based on Dr. Bauman's recommendation. Plaintiff claims that the stage manager requested he delay the surgery, and he agreed. Plaintiff alleges that the stage manager then approved the date of August 18, 2004 for the surgery and for medical leave to recover thereafter, but instructed plaintiff to request the leave from Marc Borsak (the company manager), Lon Hoyt (the musical conductor), Clint de Ganon (the house contractor), and Frank Lombardi (the production stage manager). Plaintiff alleges that all these individuals approved his leave..

Prior to his leave, however, plaintiff alleges he was told by Laura Green, defendant's general manager, that under the Actors' Equity contract, he was not eligible for the approved leave. Plaintiff alleges that Green advised him the contract did not permit leave where a performer had less then nine weeks remaining on his contract. Plaintiff was scheduled for the surgery on August 18, 2004, and his contract expired approximately seven weeks after the surgery, in early October. Plaintiff alleges that Green told him that he would be considered terminated from the show as of the date his "approved leave" began, August 17, 2004.

Plaintiff asserts, however, that the Musicians Union took a different position, stating in a letter dated September 1, 2004 that as a "hired member of the orchestra" for the run of the show, he was entitled to and approved for medical leave.

Plaintiff alleges that he had the surgery as scheduled on August 18, 2004, and remained on what he thought was approved medical leave thereafter, receiving $400 per week in workers' compensation benefits and a permanency award from defendant's workers' compensation carrier for his injury.

Plaintiff alleges that Dr. Bauman provided defendant with updates on his condition during his rehabilitation until November 2004, when plaintiff notified Hoyt, de Ganon, Borsak and Green that he intended to return to the production on November 16.

Plaintiff avers that upon arriving at the theater on November 16, 2004, he was advised by the theater manager that Green had directed he not be permitted into the theater to resume his duties.

## The Arbitration

Plaintiff also alleges that he commenced an arbitration against defendant pursuant to the Musicians Union contract, which guaranteed him employment for the run of the show. The arbitrator found, however, that plaintiff was more of an actor than a musician, and thus was bound by the Actors' Equity contract. The arbitrator then found that plaintiff's Actors' Equity contract had expired in October 2004, and ruled that plaintiff need not be reinstated. Plaintiff initially sought to ap-

peal the arbitrator's decision, but the Musicians Union declined to pursue it.[2]

### The Instant Motion[3]

In April 2008, defendant again moved to dismiss the complaint for failure to state a cause of action, arguing, as it does now before this Court, that plaintiff provided "no factual basis" to state a claim for disability discrimination, but instead asserted legal conclusions in place of facts. Defendant argued that, as plaintiff has conceded, it allowed him to work every show until he had his surgery, granting him the reasonable accommodation of performing without twisting or jumping, despite the fact that such actions were germane to the show. Defendant further argued that plaintiff's termination occurred not when he was disabled, but rather when he was ready to resume his work.

Plaintiff counters that while he could not say defendant directly told him he was terminated due to his disability, he nonetheless pleaded a prima facie case of disability discrimination. He argues that defendant perceived him to be disabled because of his torn meniscus and the permanency award he has received from workers' compensation. Plaintiff stated he was reasonably able to resume performing at the time of his termination, and that he was terminated without reason or cause.

### The Decision of the Motion Court

The court held that plaintiff had failed to state a prima facie claim of disability discrimination, offering only conclusory allegations and failing to plead a causal link between his disability and his termination. The court noted plaintiff's assertion that defendant never gave him any valid reason for termination, and found his conclusion that defendant terminated him because of his disability to be mere speculation.

### Discussion

In considering a motion to dismiss for failure to state a cause of action (CPLR 3211 [a] [7]), the court is required to accept as

---

**2.** Plaintiff challenges the ability of the arbitrator to rule on issues concerning the Actors' Equity contract, as she was not an approved arbitrator for Actors' Equity. As this is not an appeal from the arbitration decision, we take no position on the propriety of the arbitrator's ruling.

**3.** This was defendant's second motion to dismiss the complaint for failure to state a cause of action. The first was denied without prejudice to renewal in February 2008, in an order that also granted plaintiff leave to replead his complaint.

true the facts as alleged in the complaint, accord the plaintiff the benefit of every favorable inference and strive to determine only whether the facts alleged fit within any cognizable legal theory (*Sokoloff v Harriman Estates Dev. Corp.*, 96 NY2d 409, 414 [2001]). In addition, employment discrimination cases are themselves generally reviewed under notice pleading standards. For example, under the Federal Rules of Civil Procedure, it has been held that a plaintiff alleging employment discrimination "need not plead [specific facts establishing] a prima facie case of discrimination" but need only give "fair notice" of the nature of the claim and its grounds (*Swierkiewicz v Sorema N. A.*, 534 US 506, 514-515 [2002]). Applying these liberal pleading standards, we find that plaintiff has stated causes of action for violations of both the State and City HRLs based on disability discrimination.[4]

In making this determination, we note that the State HRL accords greater disability protection than the Americans with Disabilities Act (ADA),[5] and that the City HRL provides even broader protections still (*see e.g. Reilly v Revlon, Inc.*, 620 F Supp 2d 524, 541 [SD NY 2009], citing *Giordano v City of New York*, 274 F3d 740, 753 [2d Cir 2001] ["The New York State Executive Law and the New York City Administrative Code have a broader definition of 'disability' than does the ADA; neither statute requires any showing that the disability substantially limits a major life activity"]).

Accordingly, to the extent the ADA and the case law thereunder are discussed in our analysis, it is done only to provide interpretative guidance and is not binding on our application of the more stringent protections accorded by the State and City HRLs (*see e.g.* 42 USC § 12201 [b] ["Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures . . . of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities"]; *see also* Administrative Code § 8-130 ["The provisions of this title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether

---

4. We note that plaintiff's initial complaint, while perhaps less artfully pleaded, also set forth causes of action for disability discrimination sufficient to withstand the motion to dismiss.

5. For example, unlike the ADA, the State HRL definition of disability has no requirement that the physical or mental impairment substantially limit one or more major life activities of an individual (*compare* 42 USC § 12102 [1] [A]; [2] [ADA] *with* Executive Law § 292 [21] [State HRL]).

federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed"]).[6]

## The State Human Rights Law

■ Executive Law § 296 (1) (a) provides, inter alia, that it is an unlawful discriminatory practice for an employer to discharge an employee on the basis of a disability (*Germakian v Kenny Intl. Corp.*, 151 AD2d 342 [1989], *lv denied* 74 NY2d 615 [1989]). Accordingly, in order to state a cause of action for disability discrimination under the State HRL, the complaint must allege that the plaintiff suffers a disability and that the disability caused the behavior for which the individual was terminated (*Matter of McEniry v Landi*, 84 NY2d 554, 558 [1994]).

Plaintiff sufficiently pleaded that he suffered a disability when he was injured during a performance of defendant's production. Indeed, as a result of his injury, plaintiff received a permanency award from workers' compensation. He further alleges that at the time of his termination in November 2004, when he was refused entry to the theater, he was nonetheless capable of resuming his employment as a performer. Defendant's stated reason for terminating plaintiff was directly related to his disability, or defendant's perception that he was disabled, i.e., that he was not eligible for the medical leave he had taken following his surgery.

## The Musicians Union Contract

Moreover, is it clear that the disability, surgery, and plaintiff's termination under the Actors' Equity contract resulted in his termination under the Musicians Union contract as well, a contract that guaranteed him employment for the run of the show. Even assuming, arguendo, that the termination under the Actors' Equity contract was proper, plaintiff can still state a cause of action for being terminated from his Musicians Union contract because of the disability. Absent from the letters sent

---

**6.** (*See also* Local Law No. 85 [2005] of City of NY § 1 ["Restoration Act"].) Through this enactment, the City Council sought to underscore that the provisions of the New York City HRL should be construed independently from similar or identical provisions of New York State or federal statutes. Interpretations of New York State or federal statutes with similar wording may be used to aid in interpretation of the New York City HRL, viewing similarly worded provisions of federal and state civil rights laws as a floor below which the City Human Rights Law cannot fall, rather than a ceiling above which the local law cannot rise.

by defendant to plaintiff in August 2004, threatening termination from the show, is any discussion of accommodating plaintiff under the terms of the Musicians Union contract.

Indeed, although the motion court failed to address plaintiff's cause of action for termination from the Musicians Union contract, defendant was explicitly advised by the union on three separate occasions, by letters dated September 1, October 25, and November 10, 2004, that plaintiff was a hired musician for the run of the show. In addition, the November 10 letter advised defendant that pursuant to the Musicians Union contract, plaintiff's termination had to be for "just cause."

## The City Human Rights Law

■ Plaintiff also sufficiently stated a discrimination claim pursuant to the City HRL. We separate the analysis because the disability provisions of the City and State HRLs are not "equivalent," and require distinct analyses.[7]

The City HRL provides a distinct definition of "disability," defining it purely in terms of impairments: "any physical, medical, mental or psychological impairment, or a history or record of such impairment" (Administrative Code § 8-102 [16] [a]).

Based on the facts discussed herein, plaintiff also stated in his complaint a cause of action for disability discrimination under the New York City HRL. Indeed, it is likely that even if plaintiff had been found not to have stated a cause of action under the State HRL, he would have stated a cause of action under the City HRL. Plaintiff has successfully pleaded he was disabled within the meaning of the City HRL, and that he was terminated from his employment because of it.

Accordingly, the judgment of Supreme Court, New York County (Carol Robinson Edmead, J.), entered July 22, 2008, granting defendant's motion to dismiss the amended complaint alleging employment discrimination based on a disability in violation of Executive Law § 296 and Administrative Code of the City of New York § 8-107, should be reversed, on the law,

---

7. By means of the Restoration Act, the City Council rejected the notion of equivalence among the HRLs and the ADA by

"notif[ying] courts that (a) they had to be aware that some provisions of the City HRL were textually distinct from its state and federal counterparts, (b) *all* provisions of the City HRL required independent construction to accomplish the law's uniquely broad purposes, and (c) cases that had failed to respect these differences were being legislatively overruled" (*Williams v New York City Hous. Auth.*, 61 AD3d 62, 67-68 [2009]).

without costs, and plaintiff's claims pursuant to the State and City HRLs reinstated. Appeal from order, same court and Justice, entered July 8, 2008, which granted defendant's motion to dismiss the amended complaint, should be dismissed, without costs, as subsumed in the appeal from the judgment. Appeal from order, same court and Justice, entered October 1, 2008, which, to the extent appealable, denied plaintiff's motion to renew, should be dismissed as moot, without costs.

SAXE, J.P., BUCKLEY, McGUIRE and MOSKOWITZ, JJ., concur.

Judgment, Supreme Court, New York County, entered July 22, 2008, reversed, on the law, without costs, and plaintiff's claims pursuant to the State and City Human Rights Laws reinstated. Appeal from order, same court, entered July 8, 2008, dismissed, without costs, as subsumed in the appeal from the judgment. Appeal from order, same court, entered October 1, 2008, dismissed as moot, without costs.