Newson v Vivaldi Real Estate LTD. (2025 NY Slip Op 00052)

Newson v Vivaldi Real Estate LTD.

2025 NY Slip Op 00052

Decided on January 07, 2025

Appellate Division, First Department

 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: January 07, 2025
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Tanya R. Kennedy
Barbara R. Kapnick Saliann Scarpulla John R. Higgitt

Index No. 452625/22 Appeal No. 2982 Case No. 2024-00261 

[*1]Terry Newson, Plaintiff-Respondent,
v
Vivaldi Real Estate LTD., Defendant, Jason Horowytz et al., Defendants-Appellants. Coalition for the Homeless, Tenants & Neighbors, and Unlock NYC, Amici Curiae.

Defendants appeal from an order of the Supreme Court, New York County (Lori S. Sattler, J.), entered on or about December 28, 2023, which granted the Owners' motion to reargue and, upon reargument, adhered to a prior order, same court and Justice, entered June 9, 2023, denying their pre-answer motion.

Miller, Leiby & Associates, P.C., New York (Doron Leiby, David Lewittes of counsel), for appellants.
Brooklyn Legal Services, Brooklyn (Erin Evers of counsel), and Housing Works, Inc., Brooklyn (Sina Choi and Bex Rothenberg-Montz of counsel), for respondent.
Twyla Carter, The Legal Aid Society, New York (Judith Goldiner and Evan Henley of counsel), and Wilmer Cutler Pickering Hale & Dorr LLP, New York (Brendan R. McGuire and Samuel E. Frizell of counsel), for amici curiae.

 

On this appeal, we are presented with the following issue of first impression — whether owners of housing accommodations can be held vicariously liable for the discriminatory conduct of their real estate brokers under the New York City Human Rights Law (City HRL)(see Administrative Code of the City of New York § 8-107[5][a]). For the reasons that follow, we answer this question in the affirmative.
Background and Procedural History Plaintiff is an indigent person living with clinical/symptomatic Human Immunodeficiency Virus (HIV) who has been residing in an emergency shelter in a single-room occupancy hotel since 2018. Plaintiff is a client of the New York City HIV/AIDS Services Administration (HASA) and is entitled to a full HASA housing subsidy of $1,600 per month for an apartment in New York City, along with a security voucher, assistance with the broker's fee, if necessary, and the first month's rent. HASA clients, such as plaintiff, are responsible for searching for privately owned apartments within New York City. Once a HASA client locates an apartment that HASA approves within the legally mandated time frame, HASA pays rent directly to the owner on an ongoing basis. Defendants are Vivaldi Real Estate Ltd. (Vivaldi), a real estate brokerage company, Jason Horowytz, and Stephanie Wan (together, the Owners), who own studio apartment 1A at 305 Cooper Street in Brooklyn, New York (the apartment). The owners listed the apartment for rent, and Vivaldi managed the listing.
Plaintiff alleges that in March 2021, he saw the apartment listed for $1,495 per month on Zillow, a real estate website, and requested an application through Zillow, asking if the "listing accept[s] . . . HASA vouchers that [cover] brokers fees and rent coverage up to $1600." Kathy Woo, a real estate agent at Vivaldi (the agent), responded to plaintiff by email on or about April 1, 2021, that "[t]o the be[s]t of [her] knowledge the building [was] not approved to receive any housing assistance vouchers." However, no such approval was required, and the agent neither subsequently contacted plaintiff to advise he could rent the apartment nor assisted plaintiff with his inquiry or application[*2]. As a result of the agent's response, plaintiff concluded he was not allowed to rent the apartment and did not send any further correspondence.
Thereafter, in September 2022, plaintiff commenced this action, asserting separate causes of action against Vivaldi and the Owners (together, defendants). As for Vivaldi, plaintiff alleged that Vivaldi's refusal to conduct business with individuals who possessed HASA housing subsidies constituted source of income discrimination in violation of the City HRL (see Administrative Code §§ 8-107[5][a][1], [2]; [5][c]; [13][a]). As for the Owners, plaintiff alleged that they were vicariously liable for the discriminatory conduct of their agent, Vivaldi.
The Owners moved to dismiss the complaint, arguing, as relevant here, that vicarious liability under the City HRL extended only to employers and not to owners of housing accommodations, such that they could not be held vicariously liable for the agent's statements (see Administrative Code § 8-107[13][a]). Plaintiff opposed, arguing that a housing discrimination claim sounded in tort, such that owners could be held vicariously liable for the discriminatory acts of their agents and that the Owners had a nondelegable duty to comply with the City HRL's anti-discriminatory mandate. Supreme Court denied the motion, finding, in part, that § 8-107(5)(a) of the City HRL applied to owners through their agents and "[did] not require that an owner be an employer of that agent."
The Owners moved to reargue on the ground that Supreme Court misapprehended or overlooked the language of the City HRL and applicable case law that direct liability could only be imposed against owners of housing accommodations. Specifically, the Owners argued, as they do on appeal, that the express language of City HRL § 8-107(13)(a) sets forth instances when employers are vicariously liable for the discriminatory acts of their employees, and that if the legislature sought to impose vicarious liability upon housing owners, "owners" would have been included within the statute. Supreme Court rejected the Owners' argument, finding that housing discrimination was, in effect, a tort, such that traditional principles of vicarious liability applied and that § 8-107(5)(a) incorporated these common law principles to impose liability upon housing owners for an agent's acts performed within the scope of their authority.[FN1]
Analysis
Section 8-107(5)(a) of the City HRL provides:
It shall be an unlawful discriminatory practice for the owner . . . or other person having the right to sell, rent or lease or approve the sale, rental or lease of a housing accommodation, constructed or to be constructed, or an interest therein, or any agent or employee thereof:
Because of . . . any lawful source of income of such person or persons . . . .
(c) To represent to such person or persons that any housing accommodation or an interest therein is not available for inspection, sale, rental or lease when in fact it [*3]is available to such person.
(2) To declare . . . any statement . . . or to make any record or inquiry in conjunction with the prospective purchase, rental, or lease of such a housing accommodation or an interest therein which expresses, directly or indirectly, any limitation, specification, or discrimination as to . . . any lawful source of income . . . or any intent to make such limitation, specification or discrimination.
The decision to impose vicarious liability upon owners for conduct of their agents that violates the foregoing provision is grounded upon clear and unequivocal legislative intent and text of the City HRL.
Accordingly, in 2005, the New York City Council (the City Council) enacted the Local Civil Rights Restoration Act of 2005 (Restoration Act) "to clarify the scope of the [City HRL]," which the City Council determined was being "construed too narrowly to ensure protection of the civil rights of all persons covered by the law" (Local Law No. 85 [2005] of City of New York § 1). The Restoration Act provides that the City HRL "shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York state civil and human rights law, including those laws with provisions worded comparably to provisions of this title, have been so construed" (id. at §§ 1, 7; see also Administrative Code § 8-130[a]).
Following the passing of the Restoration Act, courts have emphasized that the City HRL must be broadly and independently interpreted to further this mandate. In Williams v New York City Hous. Auth., this Court highlighted that as "reflected in text and legislative history," "[the Restoration Act] represent[s] a desire that the City HRL 'meld the broadest vision of social justice with the strongest law enforcement deterrent'" (61 AD3d 62, 68, 74 [1st Dept 2009][internal citation omitted]). The Williams Court also highlighted that the City HRL mandates that "an independent liberal construction analysis [be undertaken] in all circumstances . . . [which] must be targeted to understanding and fulfilling what the statute characterizes as the City HRL's 'uniquely broad and remedial' purposes, which go beyond those of counterpart state and federal civil rights laws" (id. at 66). Accordingly, "[i]nterpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of the [City HRL], viewing similarly worded provisions of federal and state civil rights laws as a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise" (Local Law No. 85 [2005] of City of New York § 1; see also Williams, 61 AD3d at 66-67; Loeffler v Staten Island Univ. Hosp., 582 F3d 268, 278 [2d Cir 2009][describing the Restoration Act as a "one-way ratchet" to interpreting the City HRL "more liberally" than its state and federal counterparts]).
In Albunio v City of New York, the Court of Appeals [*4]also emphasized that the entire City HRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (16 NY3d 472, 477-478).
Following the decisions in Williams and Albunio, the City Council amended § 8-130 of the City HRL and explicitly confirmed that these decisions, as well as Bennett v Health Mgt. Sys., Inc. (92 AD3d 29 [1st Dept 2011], lv denied 18 NY3d 811 [2012]), which also employed an expansive application of the City HRL, "correctly understood and analyzed the liberal construction requirement[s]" of the City HRL (Administrative Code § 8-130[c]; see also Local Law No. 35 [2016] of City of New York). Therefore, the legislative history of the Restoration Act and precedent "contemplates that the [City HRL] be independently construed with the aim of making it the most progressive in the nation" (Bumpus v New York City Tr. Auth., 18 Misc 3d 1131[A], *4, 2008 NY Slip Op 50254 [U][Sup Ct, Kings County 2008], affd 66 AD3d 26 [2d Dept 2009]; see also Jordan v Bates Adv. Holdings, Inc., 11 Misc 3d 764, 770 [Sup Ct, NY County 2006]).
The City Council continued to expand the protections of the City HRL by amending § 8-107(5)(a) in 2008 to prohibit discrimination against tenants based on their source of income (Local Law No. 10 [2008] of the City of New York). In so doing, the City Council's analysis centered on landlords' discriminatory practices, observing that "some landlords refuse[d] to offer available units because of the source of income tenants . . . plan to use to pay the rent. In particular, studies have shown that landlords discriminate against holders of . . . vouchers because of prejudice they hold about voucher holders" (id.)(emphasis added).[FN2] As the lead sponsor of Local Law 10, then-Councilmember Bill De Blasio explained, the amendment would "prohibit discrimination by landlords against tenants based on lawful source of income" (Mar. 26, 2008 Comm. on Gen. Welfare Hr'g Tr. 2:10-12)(emphasis added).
The foregoing legislative intent behind the City HRL in its entirety and § 8-107(5)(a) specifically, demonstrate a strong commitment to providing robust protections against housing discrimination that was implemented to impose liability upon landlords for discriminatory conduct, including through the conduct of their real estate agents (see Sprint Communications Co. L.P. v City of N.Y. Dept. of Fin., 152 AD3d 184, 189 [1st Dept 2017], lv denied 30 NY3d 904 [2017]["The primary consideration of courts in interpreting a statute is to 'ascertain and give effect to the intention of the Legislature'"] quoting Riley v County of Broome, 95 NY2d 455, 463 [2000]; see also Matter of Yolanda D, 88 NY2d 790, 795 [1996]["we must interpret statutes in a manner consistent with and in furtherance of the legislative intent behind the enactment"]).
To that end, the amici curiae, Coalition for the Homeless (the Coalition), Tenants & Neighbors and Unlock NYC, note that landlords [*5]generally do not directly communicate with prospective tenants because brokers commonly list rental apartments after entering into an agreement with a landlord on an exclusive basis or through open listings, which is the most common way to lease an apartment. The Coalition is the nation's oldest advocacy and direct services organization, which has been instrumental in establishing and protecting the right to shelter for homeless men, women, and children in New York City, and has been involved in anti-discrimination efforts in housing since its founding. Tenants & Neighbors is a membership organization that works to preserve affordable housing in New York State, build diverse communities, and strengthen tenant protections. Unlock NYC is a not-for-profit organization that assists New Yorkers in reporting and combating source of income discrimination by providing technical support to voucher holders when seeking apartments.
Amici curiae further note that landlords typically set the criteria for rentals that brokers or agents convey to renters when reviewing applications and directly interacting with prospective tenants. Since 2021, amicusUnlock NYC has maintained a database of allegations of source of income discrimination where "[t]he vast majority of voucher holders report experiencing discrimination by a broker of an agent, not a landlord." Moreover, according to Unlock NYC, "[o]f the 1,393 individuals identified . . . as having allegedly committed source of income discrimination . . . [86 percent] worked for a brokerage firm and identified themselves as real estate salespersons, brokers, or agents." Amicus Unlock NYC further notes that only nine percent were large corporate landlords that employ in-house leasing agents, and just one percent were themselves owners or landlords.
We agree with amici curiae that absent vicarious liability, landlords would evade liability under the City HRL except when they directly interact with a prospective tenant. This is neither the mandate of the statute, nor supported by the legislative intent behind § 8-107 of the City HRL (see McKinney's Cons Laws of NY, Book 1, Statutes § 95 ["courts in construing a statute should consider the mischief sought to be remedied by the new legislation, and they should construe the act in question so as to suppress the evil and advance the remedy"]).
The text of the City HRL also supports the imposition of vicarious liability upon landlords. Specifically, the key statutory remedy in the City HRL for housing discrimination is to approve the rental and to provide housing (see Administrative Code § 8-120[a][7]). Moreover, §§ 8-122 and 8-502 permit a tenant allegedly aggrieved by discriminatory practices to seek injunctive relief. In the absence of vicarious liability against owners, who have title to the prospective property, these remedies would be unavailable and rendered meaningless (Anonymous v Molik, 32 NY3d 30, 37 [2018][a statute "must be construed as a whole and [*6]its various sections must be considered together and with reference to each other" and that "a statutory construction which renders one part meaningless should be avoided"][internal quotations and citations omitted]; see also e.g. Matter of Suarez v Williams, 26 NY3d 440, 451 [2015]["(C)ourts should not interpret a statute in a manner that would render it meaningless"]).
Moreover, the New York City Commission on Human Rights disseminated guidance concerning its interpretation of the City HRL, stating that landlords "are responsible for the actions of anyone who plays a role in processing applications for [] rental units, even if that person is not [landlord's] employee" (NY City Commn on Human Rights, FAQ for Landlords: Best Practices for Housing Providers to Avoid Source of Income Discrimination [Mar 2023]). The Commission is entitled to "great deference" in its interpretations of the City HRL (see Matter of Arif v New York City Taxi & Limousine Commn., 3 AD3d 345, 346 [1st Dept 2004]["(A)n administrative agency's construction and interpretation of its own regulations and of the statute under which it functions are entitled to great deference"]).
Contrary to the broad remedial intent of the statute, the Owners urge us to apply a restrictive reading of the City HRL and rely upon the language of § 8-107(13)(a) of the City HRL. This provision states that "[a]n employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions 1 and 2 of this section [i.e., other than employment and vocational training]." The Owners argue that the City Council could have included housing owners within this section but purposely chose to exclude them, evidencing a specific intent to limit application of vicarious liability and common law agency principles in claims under the City HRL. We decline to apply such a narrow and restrictive interpretation, which is contrary to the spirit and the letter of the City HRL, and would require us to impermissibly ignore the mandate of § 8-130 (see Williams, 61 AD3d at 69 n 8 ["(Courts) are not free to give force to one section of the law that has specifically been amended . . . and decline to give force to another . . . . We must give force to all amendments, and not relegate any of them to window dressing"]).
Next, the Owners' reliance on Doe v Bloomberg L.P. (36 NY3d 450 [2021]) is misplaced. In Doe, the Court of Appeals analyzed the definition of "employer" in the context of the City HRL and concluded that the co-founder and CEO of Bloomberg LP was not an "employer" under the statute and, thus, could not be held vicariously liable for the offending conduct of the company's employee under § 8-107(13)(a) (id. at 459-463). Doe does not stand for the proposition that owners of housing accommodations cannot be held vicariously liable for discrimination through their agents; and at no point did the Court [*7]of Appeals conclude that common law principles would not apply to the statute. Instead, the Court of Appeals stated that "[t]he text of the City HRL demonstrates no intent to displace []settled legal principles" of common-law tort liability (id. at 461). The Doe Court went on to explain that the City HRL, similar to a common-law tort action, "imposes vicarious liability on the corporation for torts of its employees and agents committed within the scope of their job duties" (36 NY3d at 460).
In any event, "the Legislature is presumed to be aware of the law in existence at the time of an enactment and to have abrogated the common law only to the extent that the clear import of the language of the statute requires" (Caboara v Babylon Cove Dev., LLC, 54 AD3d 79, 83 [2d Dept 2008]; see also Matter of Tuzzolino, 208 AD3d 664, 666 [2d Dept 2022]["(i)t is a canon of statutory construction to disfavor interpretations that overrule the common law"]). Nothing in the language of the City HRL requires a conclusion that the City Council intended to abrogate common law principles of vicarious liability in housing discrimination claims.
The Owners' argument that common law principles are inapplicable here is further belied by Meyer v Holley, wherein the United States Supreme Court reaffirmed that "an action brought for compensation by a victim of housing discrimination is, in effect, a tort action" to which ordinary tort-related vicarious liability rules apply (537 US 280, 285 [2003]). Federal courts have also concluded that landlords may be held vicariously liable for the discriminatory acts of their real estate agents and property managers under the similarly worded provisions of the Fair Housing Act (FHA)(42 USC §§ 3601 et seq.)(see Cleveland v Caplaw Enterprises, 448 F3d 518 [2d Cir 2006]; Housing Rights Initiative v Compass Inc., 2023 WL 1993696, *19, 25, 2023 US Dist LEXIS 25235, *56-57, 71 [SD NY, Feb. 14, 2023, No. 21CV2221 (SHS)]; see also e.g. Thurmond v Bowman, 211 F Supp 3d 554 [WD NY 2016][granting plaintiff summary judgment on her FHA claim against the defendant property manager and owners of an apartment unit based upon property manager's discriminatory conduct]).[FN3] Since the federal counterpart is a "floor below which the [City HRL] cannot fall," the City HRL must also provide for vicarious liability in housing discrimination claims, absent statutory language to the contrary (Williams, 61 AD3d at 66-67 citing Local Law No. 85 [2005] of City of New York § 1; see also Bennett, 92 AD3d at 37 n 6; see also Meyer v Holley, 537 US 280, 285 [2003]). There is no basis to depart from this well-settled authority.
The Owners' contention that it is improper to rely on federal law is erroneous. There is no support for the position that the FHA is not a "similarly worded" statute intended to guide the independent review required under the City HRL. Both the FHA and City HRL prohibit discrimination in housing accommodations, have the same remedial [*8]purpose — to ensure all persons enjoy equal access to housing opportunities — and utilize verbatim language concerning housing practices (compare 42 USC § 3604[d] and City HRL § 8-107[5][a][1][c]; 42 USC § 3604[c] and City HRL § 8-107[5][a][2]). Additionally, the Owners' position is belied by a plethora of cases that turned to the FHA when analyzing claims under the City HRL (see Williams v New York City Hous. Auth., 61 AD3d 62; Wilson v Phoenix House, 42 Misc 3d 677, 710 [Sup Ct, Kings County 2013]["The New York State and federal courts have found a substantial identity between the language and purposes of . . . [the City HRL], and the federal Fair Housing Act."]; Charlier v 21 Astor Place Condominium, 2024 WL 4026253 at *2, 2024 US Dist LEXIS 157415, *5 [SD NY Sep. 3, 2024, No. 22CV05903 (LTS)]; Fortune Society v Sandcastle Towers Housing Development Fund Corp., 388 F Supp 3d 145, 178 [ED NY 2019][City HRL "housing discrimination claims are analyzed under the same standard as claims made under the FHA because they contain language that is substantively identical to that of the FHA, differing in that the NYSHRL and [City HRL] cover a broader range of protected classes"][internal citation omitted]; Martinez by Martinez v Lexington Garden Associates, 336 F Supp 3d 270, 278 [SD NY 2018]; Fair Housing Justice Center, Inc. v Allure Rehabilitation Services LLC, 2017 WL 4297237 at *7, 2017 US Dist LEXIS 157882, *18 [ED NY Sep. 26, 2017, No. 15CV6336 (RJD)(LB)]; LC v LeFrak Organization, Inc., 987 F Supp 2d 391, 403-404 [SD NY 2013]; Short v Manhattan Apartments, Inc., 916 F Supp 2d 375 [SD NY 2012]).
Finally, the Owners' attempt to distinguish the FHA from the City HRL by relying on the fact that the FHA does not include "source of income" as a protected factor in housing discrimination cases is misplaced and ignores well-settled precedent, history, analysis and text of both the City HRL and the FHA. Given the substantial identity between the language and purpose of the FHA and City HRL, the exclusion of "source of income" as a protected factor in the FHA in no way limits the guidance provided by the FHA as a baseline when analyzing claims under the City HRL.
Therefore, we conclude that landlords can be held vicariously liable for their agents' discriminatory conduct.
Allegations of the Complaint
Considering the foregoing conclusion, we turn to the allegations of plaintiff's complaint. Plaintiff alleges that the agent acted on the Owners' behalf and represented that the subject apartment was unavailable to plaintiff because of his use of HASA vouchers. Viewing the allegations in a light most favorable to plaintiff (see Vig v New York Hairspray Co., L.P., 67 AD3d 140, 144-145 [1st Dept 2009]) and considering the City HRL's liberal construction, Supreme Court correctly held that at this procedural posture, the complaint sufficiently pleaded facts alleging a cause of action for discrimination based on source of income under the City HRL § 8-107[*9](5). To succeed on plaintiff's second cause of action asserted against the Owners, it will be plaintiff's burden to ultimately establish the relevant elements of agency and prove that discrimination occurred in violation of the City HRL.
Accordingly, the order of the Supreme Court, New York County (Lori S. Sattler, J.), entered on or about December 28, 2023, which granted the Owners' motion to reargue and, upon reargument, adhered to a prior order, same court and Justice, entered June 9, 2023, denying their pre-answer motion to dismiss, should be affirmed, without costs.
Order, Supreme Court, New York County (Lori S. Sattler, J.), entered on or about December 28, 2023, granting reargument and adhering to a prior order, same court and Justice, entered June 9, 2023, affirmed, without costs.
Opinion by Kennedy, J.P. All concur.
Kennedy, J.P., Kapnick, Scarpulla, Higgitt, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: January 7, 2025

Footnotes

Footnote 1: While the Supreme Court "denied" the motion to reargue, the court addressed the merits and, in so doing, effectively granted reargument. Therefore, the order is appealable (see Lewis v Rutkovsky, 153 AD3d 450, 453 [1st Dept 2017]; Pezhman v Chanel, 126 AD3d 497 [1st Dept 2015]).

Footnote 2: The City Council further expanded the City HRL's housing protections, rendering it unlawful to discriminate against certain New Yorkers with criminal records when applying for housing (see Local Law No. 24 [2024] of City of New York).

Footnote 3: Courts have also applied broad liability principles in the housing context under the New York State Human Rights Law (see Matter of State Div. of Human Rights v Muia, 176 AD2d 1142, 1143-1144 [3d Dept 1991]; Matter of A-1 Realty Corp. v State Div. of Human Rights, 35 AD2d 843, 844 [2d Dept 1970]).